1084

UNITED STATES of America

v.

Anthony PUNGITORE, Jr., Appellant
in No. 89–1371.

UNITED STATES of America

v.

Joseph GRANDE. Appellant in
No. 89–1372.

UNITED STATES of America

v.

Francis IANNARELLA, Jr., Appellant
in No. 89–1393.

UNITED STATES of America

v.

Phillip NARDUCCI. Appellant in
No. 89–1395.

UNITED STATES of America

v.

Salvatore SCAFIDI. Appellant in
No. 89–1396.

UNITED STATES of America

v.

Nicholas VIRGILIO. Appellant in
No. 89–1397.

UNITED STATES of America

v.

Charles IANNECE. Appellant in
No. 89–1400.

UNITED STATES of America

v.

Salvatore Wayne GRANDE. Appellant
in No. 89–1401.

UNITED STATES of America

v.

Joseph PUNGITORE. Appellant in
No. 89–1402.

UNITED STATES of America

v.

Frank NARDUCCI, Jr., Appellant
in No. 89–1403.

UNITED STATES of America

v.

Ralph STAINO, Jr., Appellant in
No. 89–1404.

UNITED STATES of America

v.

Salvatore J. MERLINO. Appellant
in No. 89–1409.

UNITED STATES of America

v.

Nicodemo SCARFO. Appellant in
No. 89–1446.

UNITED STATES of America

v.

Joseph CIANCAGLINI. Appellant
in No. 89–1448.

Nos. 89–1371 to 1372, 89–1393, 89–1395
to 1397, 89–1400 to 1404, 89–1409,
89–1446 and 89–1448.

United States Court of Appeals,
Third Circuit.

Argued and Submitted under Third Circuit
Rule 12(6) April 25, 1990.

Decided Aug. 1, 1990.

Rehearing and Rehearing In Banc
Denied Sept. 10, 1990.

Michael J. Kelly, Asst. Defender, Defender Ass'n of Philadelphia, Federal Court Div., Philadelphia, Pa., for Anthony Pungitore, Jr.

Willis W. Berry, Jr., Philadelphia, Pa., for Joseph Grande.

Robert E. Madden, Philadelphia, Pa., for Francis Iannarella, Jr.

Stanford Shmukler (argued), Philadelphia, Pa., for Frank Narducci, Jr. and Phillip Narducci.

Christopher G. Furlong, Springfield, Pa., for Salvatore Scafidi.

Stephen P. Patrizio (argued), Dranoff & Patrizio, Philadelphia, Pa., for Nicholas Virgilio.

Louis T. Savino, Jr., Philadelphia, Pa., for Charles Iannece.

Hope C. Lefeber, Philadelphia, Pa., for Salvatore Wayne Grande.

Peter Goldberger (argued), Philadelphia, Pa., for Joseph Pungitore.

M.W. Pinsky, Westmont, N.J., for Ralph Staino, Jr.

Edwin J. Jacobs, Jr., Jacobs & Bruso, PA, Atlantic City, N.J., for Salvatore J. Merlino.

Robert F. Simone, Philadelphia, Pa., Milton E. Grusmark (argued), Miami, Fla., for Nicodemo Scarfo.

Robert E. Welsh, Jr. (argued), Philadelphia, Pa., for Joseph Ciancaglini.

Michael M. Baylson, U.S. Atty., Frank J. Marine (argued), Lead Appellate Atty., U.S. Dept. of Justice, Washington, D.C., Joel M. Friedman, David E. Fritchey, Arnold H. Gordon, Louis R. Pichini, Albert J. Wicks, Asst. U.S. Attys., U.S. Dept. of Justice, Philadelphia Strike Force, Philadelphia, Pa., for the U.S.

Before BECKER, GREENBERG and GARTH, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

TABLE OF CONTENTS

I. INTRODUCTION ... 1097
II. THE FACTS ... 1097
 A. MURDERS AND ATTEMPTED MURDERS ... 1099
 B. ILLEGAL GAMBLING OPERATIONS ... 1101
 C. THE SHAKEDOWN OPERATION ... 1102
III. DISCUSSION ... 1102
 A. CONSTITUTIONALITY OF THE RICO STATUTE ... 1102
 B. SUCCESSIVE PROSECUTIONS ... 1105
 1. Dual Sovereignty: Successive Prosecutions for the Falcone and Testa Murders ... 1105
 2. Successive Federal Prosecutions of the Rouse Extortion ... 1107
 3. Successive RICO Prosecutions of Joseph Ciancaglini ... 1112
 C. SENTENCING ISSUES ... 1115
 1. Consecutive Sentences for RICO Conspiracy and Substantive Offenses ... 1115
 2. Consecutive Sentencing of the Narduccis following state life sentences for the D'Alfonso murder ... 1117
 D. PROSECUTORIAL MISCONDUCT ... 1120
 1. Improper Prosecutorial Vouching ... 1120
 2. Other Prosecutorial Misconduct ... 1127
 E. SUFFICIENCY OF THE EVIDENCE ... 1128
 1. Virgilio ... 1129
 2. Ciancaglini ... 1133

F. CHALLENGES TO THE INDICTMENT ...... 1134
 1. Alternative Theories on Murder Predicates and Inclusion of Conspiracies as Predicate Acts in RICO Conspiracy Charge ...... 1134
 2. Duplicitous Pleading ...... 1135
 3. Claim of Fatal Variance ...... 1136
G. IMPLICATION OF SCARFO'S ATTORNEY IN ROUSE EXTORTION ...... 1137
 1. Anthony Pungitore's Claim of Joint Representation ...... 1139
 2. Prejudicial Effect on Scarfo's Co–Defendants ...... 1141
H. CHALLENGES TO THE JURY INSTRUCTIONS ...... 1144
 1. Instructions Regarding Reasonable Doubt ...... 1144
 2. Instructions Regarding RICO and Co–Conspirator Liability ...... 1145
I. EVIDENCE QUESTIONS ...... 1148
 1. Expert Testimony, Special Agent James Kossler ...... 1148
 2. Reference to D'Alfonso Murder ...... 1149
 3. Evidence of Iannece's Flight ...... 1150
IV. CONCLUSION ...... 1152

## I. INTRODUCTION

These consolidated appeals are the latest saga in the government's dismantling of the Philadelphia branch of La Cosa Nostra. Following a ten week trial which concluded on November 19, 1988, in the Eastern District of Pennsylvania, appellants, all members of the Nicodemo Scarfo crime family, were found guilty of conspiring to participate and participating in the affairs of an enterprise through a pattern of racketeering activity and, in some cases, through the collection of unlawful debts, in violation of RICO, 18 U.S.C. §§ 1962(d) and (c).[1]

In addition, Joseph Pungitore was convicted of participating in a conspiracy to distribute methamphetamine and Nicodemo Scarfo, Salvatore Merlino, and Joseph Ciancaglini were convicted of possession of methamphetamine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1).[2] Scarfo, Merlino and Joseph Pungitore, also were convicted of engaging in illegal sports bookmaking, in violation of 18 U.S.C. § 1955. Finally, Francis Iannarella, Jr. and Salvatore Scafidi were convicted of conducting an illegal lottery business, in violation of 18 U.S.C. § 1955(b). Appellants filed post trial motions which were denied by the district court. *United States v. Scarfo*, 711 F.Supp. 1315 (E.D.Pa.1989). These appeals followed.

## II. THE FACTS

■ We are bound, after a jury has delivered a guilty verdict, to interpret the evidence in a light most favorable to the government. With that in mind, we offer the following background facts.

The enterprise involved in this case was part of a nationwide criminal organization commonly known as the Mafia or "La Cosa Nostra."[3] La Cosa Nostra (LCN) is headquartered in New York and headed by a commission of eleven "bosses," who in turn direct the illegal activities of regional organized crime "families." The national scope of the Mafia is demonstrated by the fact that of its eleven bosses five are from New York City and six are from other cities throughout the country. The Mafia seems

---

1. The appellants indicted for a RICO offense predicated upon the collection of unlawful debt were Scarfo, Salvatore Merlino, Charles Iannece, Salvatore Scafidi, Joseph Pungitore, and Francis Iannarella, Jr. Jt.App. at 180.

2. Scarfo and Merlino were convicted of the possession offenses charged in Counts 10 and 11 of the superseding indictment. Ciancaglini was convicted under Count 10 only. Pungitore's conviction stemmed from an unrelated methamphetamine distribution conspiracy charged in Count 5.

3. "La Cosa Nostra" is an Italian phrase which literally translates as "our thing" or "this thing of ours." Tr. 10/10/88 at 72.

to operate a government parallel to that in Washington, although as will be seen changes in its power structure are far more abrupt. Tr. 10/26/88 at 178. The 60 member Scarfo crime family involved here covers Mafia operations in Eastern Pennsylvania and much of New Jersey. *Id.*

A crime family is a highly structured criminal enterprise with a well defined chain-of-command. At the apex of the family's hierarchy is the "boss," who carries sole authority to approve murders and induct new members into the family. Tr. 10/26/88 at 178. A "consigliere" and "underboss" comprise the next tier in the family's organizational hierarchy. *Id.* at 178. The consigliere functions as an advisor to the boss and assists in the settlement of disputes among members, while the underboss oversees the family's illegal endeavors when the boss is unavailable and conveys orders to members. Under the consigliere and underboss are the "capos" or "captains," who control "crews" or "regimes" of "soldiers," otherwise known as "made men." The soldiers, in turn, sponsor various "associates," who are best described as criminal colleagues of the family who, for various reasons, have not been formally initiated into its ranks.

The criteria for becoming a member of the Scarfo family are somewhat daunting. To qualify, an aspiring associate must be a male of Italian descent who has participated in a murder pursuant to the boss's order. Tr. 10/10/88 at 80, 90. A primary incentive for joining the family is that the soldier then commands considerable respect from non-Mafia criminals, as his illegal endeavors are backed by "the strength of the Mafia," that is, its wellfounded reputation for achieving its objectives through violent means. Tr. at 10/26/88 at 201. Indeed, its members recognize it as "a second government." *Id.* The soldier also becomes privy to the family's "political" and "union" connections.

*Id.* at 200–01. As Thomas DelGiorno put it, becoming a ranking member of the family means the "difference of being in the major leagues and minor leagues as far as gangsters are concerned." Tr. 10/10/88 at 79. Of course, the Mafia does not look lightly upon the obligations of its members, for loyalty to it comes before "everything, your wife, your kids, your mother, everything." Tr. 10/28/88 at 201. The position of Frank and Phillip Narducci as appellants in this case demonstrates this as their father was murdered on Scarfo's orders.

It is difficult to chart the history of the Philadelphia Mafia, given its frequent personnel changes caused by the violent deaths of several of its members. It is clear, however, that Angelo Bruno served as boss from approximately 1960 until his murder in 1980, when he was succeeded by Phillip Testa.[4] Appellant Nicodemo Scarfo functioned as consigliere under Testa and became boss after Testa was murdered by being blown up in his house in early 1981. Scarfo initially appointed Frank Monte as his consigliere and appellant Salvatore Merlino as his underboss. However, in February, 1986, Scarfo demoted Merlino to capo and replaced him with Philip Leonetti, who previously had been a capo.[5]

In 1981, the capo ranks included appellant Joseph Ciancaglini, Frank Narducci, Sr., and Leonetti, as well as Santo Idone, Joseph Scafidi and Freddie Iezzi. Around January, 1982, Lawrence Merlino, Salvatore Merlino's brother, was promoted to capo, and appellants Francis Iannarella and Joseph Pungitore, along with co-conspirators Eugene Milano, Thomas DelGiorno and Pasquale Spirito, became soldiers.[6] Existing members of the soldier ranks included appellants Salvatore Wayne Grande and Frank Narducci, Jr. Appellant Nicholas Virgilio became a soldier a few months later. In the fall of 1984, appellants

---

**4.** After Bruno was killed, his consigliere Antonio Caponigro, known as Tony Bananas, also was killed. Tr. 10/10/88 at 81.

**5.** Leonetti was a defendant in this case and was convicted but has withdrawn his appeal.

**6.** DelGiorno testified pursuant to a plea agreement with the government. Spirito was murdered on April 26, 1983. Spirito's murder was one of thirty-nine predicate acts of racketeering supporting appellants' RICO convictions.

Charles Iannece and Joseph Grande,[7] along with government witness Nicholas Caramandi, became made members and appellant Iannarella and DelGiorno were promoted to acting capos. Appellant Phillip Narducci and Nicholas Milano became made members in February, 1986, and Iannarella and DelGiorno became full capos. Finally, in June 1986, appellants Salvatore Scafidi, Ralph Staino, Jr. and Anthony Pungitore, Jr. became made members.

Over the course of the conspiracy, which was alleged in the indictment to run from April, 1976 through October, 1987, Jt.App. at 128, the Scarfo family's criminal activities included nine murders, four attempted murders, drug trafficking, the conduct of illegal gambling businesses, the extortionate collection of "street taxes" from non-LCN drug dealers and operators of illegal gambling businesses, the collection of unlawful gambling debts, and the collection of various usurious loans. We shall not describe in detail the factual circumstances of all of these crimes because, with few exceptions, appellants understandably have not challenged the sufficiency of the evidence to support their convictions. However, it is appropriate for us to overview them briefly so as to convey a sense of the extraordinary breadth of the evidence the jury had before it of appellants' criminal activity in Pennsylvania and southern New Jersey.

## A. MURDERS AND ATTEMPTED MURDERS

The jury's answers to special interrogatories on the RICO charges indicated that each of the appellants had participated in a murder, attempted murder, or conspiracy to murder. Jt.App. at 1230–62. While the motives for the murders and attempted murders varied, each appears to have been carefully planned and carried out pursuant to Scarfo's instructions.

Vincent Falcone, a cement contractor who socialized with various members of the enterprise, including Scarfo, Philip Leonetti, and Lawrence Merlino, tr. 10/25/88 at 48–49, was murdered on December 16, 1979, because he made disparaging comments concerning Scarfo and Philip Leonetti.[8] Joseph Salerno, Jr. testified that in late 1979, Scarfo asked him in a restaurant in Philadelphia if he had any guns and he answered that he owned a .32 caliber revolver and a rifle.[9] Tr. 10/25/88 at 43–44. A few weeks later, at Scarfo's request, Salerno brought the guns to the office of Scarf, Inc. on Georgia Avenue in Atlantic City where Scarfo, Leonetti, and Lawrence Merlino took possession of them. Id. at 47–48.

Salerno further testified that on the night of the murder, he was home in Brigantine, New Jersey, when he received a call to go over to the office of Scarf, Inc. which he did. When he arrived there he indicated that he wanted to go home to be with his children and to decorate the Christmas tree but instead was induced to drive with Falcone, Leonetti, and Merlino to an apartment in Margate, New Jersey, where Scarfo was waiting. Id. at 55–57. Scarfo, who was watching television, told Falcone to fix some drinks. Id. at 57. Within minutes after Falcone reappeared with the drinks, Leonetti, using Salerno's gun, shot Falcone once in the head. According to Salerno, Scarfo then stated " 'I think, I'll give him another one.' " Leonetti responded, " 'No ... I'll give it to him' " and fired an additional shot into Falcone's chest. Id. at 58. Pursuant to Scarfo's instructions, Leonetti and Merlino then left the premises to dispose of the gun and pick up Falcone's car, id. at 58, and Salerno tied up Falcone's body and wrapped it in a blanket. As Salerno performed his assigned task, Scarfo stated " 'I love this ... I love it.' " Id. at 62. When Merlino returned with Falcone's car, Salerno helped

---

7. Joseph Grande is Salvatore Wayne Grande's brother.

8. Joseph Salerno, Jr. testified that Falcone was killed because he told Salvatore Merlino that Philip Leonetti should not be in the concrete

business and that Scarfo was "crazy." Tr. 10/25/88 at 74–75.

9. When in his office, Scarfo referred to guns as "chandeliers" because of his concern that there might be listening devices there.

him put Falcone's body into the trunk. *Id.* at 65, 69. The co-conspirators then abandoned the car in another location in Margate, cleaned the apartment and disposed of their clothing in a sewer. They then had dinner at Scarfo's apartment. Tr. 10/25/88 at 69–70, 71–72, 74, 76. Falcone's murder was charged against Scarfo and co-defendant Leonetti as racketeering act 3.

In December 1979, Salerno began to cooperate with state and federal authorities investigating the Falcone murder and other crimes committed by members of the enterprise. Tr. 10/25/88 at 83. With good reason he was concerned about his safety and that of his family and thus sought and obtained protection from the Atlantic County Prosecutor. In the summer of 1982, he testified against Scarfo in a proceeding before the New Jersey Division of Gaming Enforcement and in a proceeding concerning a union described as "Local 54 Bartender's Union." Tr. 10/25/88 at 92. After this testimony Scarfo, Salvatore Merlino, and Phillip Narducci attempted to murder Salerno's father, Joseph Salerno, Sr. Tr. 10/11/88 at 20–23; 10/25/88 at 92. At that time, Salerno, Jr. was inaccessible because he and his family had entered the federal witness protection program. Tr. 10/25/88 at 88. Phillip Narducci told DelGiorno that he appeared at Joseph Salerno, Sr.'s office in Wildwood Crest, New Jersey,

and shot him when he opened the door. *Id.* at 22. On these facts, Scarfo, Merlino and Narducci were found guilty of racketeering acts 7(a) and (b), which charged them with conspiracy to murder and attempted murder.

Judge Edwin Helfant's murder also is indicative of the way in which this enterprise operated. On February 15, 1978, Virgilio, wearing a ski mask to avoid identification, shot and killed Judge Helfant, a former municipal court judge in Atlantic County, New Jersey, in the Flamingo Bar and Restaurant in Atlantic City. Scarfo later told DelGiorno and others, described by DelGiorno as "Philip, Chuckie, Larry, Faffy, [and] the Blade," that he had instructed Virgilio to kill Judge Helfant because Helfant had accepted $12,000 to fix a case involving Virgilio but had not done so. Tr. 10/10/88 at 132–33. Scarfo drove the get-away car at the time of the murder and later arranged a false alibi for Virgilio. *Id.* at 133–35. Scarfo and Virgilio were found guilty of the Helfant murder as charged in racketeering act 1 of the RICO counts.

The evidence also shows that the appellants killed in response to a member's showing of disloyalty to the organization,[10] to a drug dealer's refusal to pay the street tax to the enterprise,[11] and to eliminate a

---

**10.** Frank Narducci, Sr., father of appellants Phillip and Frank Narducci Jr., was murdered on January 7, 1982 by Scarfo, Ciancaglini, and Joseph Pungitore, in retaliation for his alleged participation in the murder of Phillip Testa, the former boss of the Philadelphia family. Tr. 10/10/88 at 119. Acting pursuant to Scarfo's instructions, Ciancaglini telephoned the shooters, Pungitore and Salvatore Testa, when Narducci, Sr. left a federal courtroom, where he was involved in a proceeding. Tr. 10/4/88 at 62–63. Pungitore and Testa then shot Narducci when he returned to his home. Tr. 10/10/88 at 118–19.

Pasquale Spirito also was murdered for showing disloyalty to the enterprise. According to DelGiorno's testimony, Spirito was killed because he severely criticized the leadership of Scarfo, Salvatore Merlino and others. Caramandi and appellant Iannece, at a wedding reception in late April, 1983, received orders from Merlino to kill Spirito. As it happened, Iannarella, who was at that reception, was planning a future wedding and was advised by Merlino, referring to Spirito, who also was at the recep-

tion, "don't send him no invitation, save the money, he won't need it." Tr. at 10/10/88 at 162.

On September 14, 1984, less than three years after the Narducci murder, Salvatore Testa fell from Scarfo's graces and was murdered because he was not following orders and was "getting too big." Tr. 10/11/88 at 53.

**11.** DelGiorno testified that on October 6, 1981, acting pursuant to Scarfo's instructions, he, Ciancaglini, and Iannarella killed John Calabrese, a drug dealer, outside a Philadelphia bar because Calabrese refused to pay a percentage of his profits from his drug business over to Scarfo. Tr. 10/10/88 at 107–08, 110. Scarfo also had expressed concern that Calabrese could turn some "motorcycle guys" he controlled against the enterprise. *Id.* at 110.

A similar motive was proven for the attempted murder of Steven Vento, Jr. Appellants Scarfo, Iannarella, Iannece, Staino, Scafidi, and Anthony Pungitore each were found guilty of conspiring and attempting to murder Steven Vento on May 27, 1986, while Vento was in his

faction of the enterprise's membership which threatened Scarfo's leadership.[12]

## B. ILLEGAL GAMBLING OPERATIONS

Appellants conducted four illegal gambling operations, three numbers businesses and a sports betting business. Thomas DelGiorno ran the most profitable numbers business. He testified that his business operated continuously from 1976 until 1986, when he began to cooperate with law enforcement officials, tr. 10/11/88 at 83–85. DelGiorno employed between ten and thirty individuals as salaried numbers writers. *Id.* at 86, 88. The writers turned their work into one of up to five "numbers offices" which were located, for the most part, in private homes. *Id.* at 86–87. Over the business's ten-year history, average revenues ranged from $10,000 to $100,000 per week. *Id.* at 89–90. This business was able to compete with the state lotteries because the players could get credit, would be paid right away if they hit, and would not have to pay taxes on their winnings. *Id.* at 89.

Appellant Iannarella began work for DelGiorno as a numbers office employee receiving bets in the late 1970's, and served as manager of the business from the early 1980's until mid–1985, when he was replaced by Scafidi. *Id.* at 91–94. As managers, Iannarella and Scafidi were responsible for supervising all of the offices and employees, collecting gambling debts and bets from the numbers writers, and paying the employees. *Id.*

In 1982, appellant Salvatore Merlino and DelGiorno became partners in another numbers business in the Philadelphia area. The Merlino–DelGiorno business was managed by Scafidi and received approximately $3000 to $5000 in bets each week, until it closed operations in February, 1986. *Id.* at 96–98.

A third numbers business was operated by appellant Joseph Pungitore in partnership with Michael Madgin from December, 1985 until early 1987. Pungitore financed the business and supervised collections from the numbers writers. Pungitore's business regularly employed more than five workers and brought in approximately $14,000 in bets each week.

The illegal sports betting business was conducted by appellants Scarfo, Salvatore Merlino and Joseph Pungitore and co-defendant Leonetti in Philadelphia from 1983 until late 1986. In 1983, Pungitore, DelGiorno and Salvatore Testa each invested $25,000 as partners in the business. After Salvatore Testa was murdered on September 14, 1984, Scarfo and Salvatore Merlino assumed his one-third interest in the business and split one third of the business's profits. When Philip Leonetti replaced Merlino as underboss in February, 1986, he took over Merlino's ownership interest. Joseph Pungitore managed the business's daily operations and, after DelGiorno became a cooperating government witness, con-

---

car on a South Philadelphia street. Tr. 10/6/88 at 17–19. The matter of Vento's murder was first raised at a communion party for Salvatore Grande's daughter but was not resolved at that time. Tr. 10/13/88 at 5. Eventually the decision to murder Vento was made after Vento resisted an attempt by Iannece and Caramandi to shake him down for drug money. Tr. 10/13/88 at 4–6.

**12.** Several of the murders and attempted murders were committed to eliminate the Riccobene faction of the crime family. In early 1982, Scarfo resolved to kill Harry Riccobene, a long-standing member, because he had questioned Scarfo's ability to head the organization. According to DelGiorno, Riccobene was insubordinate and becoming too independent of Scarfo, and had made it clear that "he didn't feel that

Nicki was capable of being a boss. He felt that Nicki was too greedy, too selfish, and too vicious to be the boss." Tr. 10/10/88 at 142. Members of the organization made two attempts on Harry Riccobene's life, one on June 8, 1982, and the other on August 21, 1982. A number of Harry Riccobene's family members and associates also were targeted for murder. Tr. 10/10/88 at 165. Several appellants participated in the attempted murder of Frank Martines on October 14, 1983, *id.* at 165, 167–69, and the murder of Salvatore Tamburrino on November 3, 1983. *Id.* at 171–74. The vendetta against the Riccobene faction appears to have ended with the murder of Harry's brother, Robert Riccobene, on December 6, 1983. Tr. 10/11/88 at 19–20.

trolled the business's $300,000 bank roll. Tr. 10/12/88 at 24.

The sports betting operation appears to have been a highly successful endeavor, which provided year-round profits from football, baseball and basketball bets. Tr. 10/12/88 at 16–20. It involved 30 to 40 bookies turning their work into five offices, received more than $2000 in bets on every day of its operation, and on a typical Sunday received $175,000 to $200,000 in bets. *Id.* Tr. 10/21/88 at 25–35.

## C. THE SHAKEDOWN OPERATION

In early 1982, Scarfo approved a scheme to extort money from drug dealers and bookmakers. Tr. 10/12/88 at 36–37, 47–48. Ciancaglini told DelGiorno that he and Pat Spirito, with Scarfo's permission, had formed a crew, made up of Charles Iannece, Nicholas Caramandi, and Ralph Staino, to extort or "shake down" bookmakers, and suggested that DelGiorno form a similar crew. Tr. 10/12/88 at 47–48. Ciancaglini was in charge of the crew and Spirito, a made member, was responsible for directly supervising its activities. The crew received half of the proceeds from the shakedowns, and the remainder was equally divided among Scarfo, Ciancaglini, Salvatore Merlino, Philip Leonetti, Lawrence Merlino and Frank Monte. *Id.* at 49. After Frank Monte was killed in 1982, Salvatore Testa received his share of the shakedown proceeds, until he too was killed on September 14, 1984. *Id.* at 66. Victims of the shakedowns were told that they would be killed if they failed to pay the "street tax." *Id.* at 37.

Eventually, additional crews were formed and the co-conspirators extended their shakedown operations to include drug dealers. Although bookmakers paid regular sums every week, receipts from drug dealers, called "extras," were more sporadic, because "[d]rug dealers don't work every week." *Id.* at 70–71. In an average month, the shakedown proceeds ranged from $24,000 to $40,000. It is not clear from the record whether this sum included the "extras" from drug dealers. *Id.* at 71–72, 77.

The co-conspirators were careful not to shake down individuals associated with LCN. To that end, Scarfo, Leonetti, Salvatore Merlino, and DelGiorno provided the crews with names of individuals to target.[13] From the beginning of the scheme until about February, 1986, Caramandi delivered a weekly tally sheet recording the shakedown collections and the leadership's fifty percent share to various designated co-conspirators to give to Scarfo. Tr. 10/12/88 at 69–70; 10/21/88 at 21–26; 10/28/88 at 13–15. Thereafter, the tally sheets were delivered by assorted co-conspirators, including DelGiorno, Iannarella, Scafidi, and Joseph Grande, to either Scarfo or Leonetti. Tr. 10/12/88 at 69–70. In general, the shakedown operation appears to have been a highly structured and profitable endeavor. As the district court observed, "Literally hundreds of shakedown victims paid a street tax that provided a steady and lucrative stream of revenue for the mob." *United States v. Scarfo*, 711 F.Supp. at 1339.

## III. DISCUSSION

## A. CONSTITUTIONALITY OF THE RICO STATUTE

■ Scarfo and Staino contend that the RICO statute is unconstitutionally vague because the pattern of racketeering requirement is not defined with sufficient clarity to place defendants on notice as to

---

**13.** DelGiorno testified as follows:

Q: Would the decision as to who would be shaken down be made by Nicholas Caramandi and Charles Iannece alone, or would other people participate?
A: No, they would have to—unless they were actually positive that the guy was with nobody, and if they had any doubts, they had to come to me and get him checked out.

Q: Were there ever any other people that had input as—into who would be shaken down?
A: Yes, Scarfo would send us names, Leonetti would send us names, Chuckie [Salvatore Merlino] would send us guys.
Tr. 10/12/88 at 72.

what conduct falls within its parameters.[14] Appellants rely heavily on Justice Scalia's concurrence in *H.J., Inc. v. Northwestern Bell Telephone Co.,* — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), which hinted that the RICO statute might be vulnerable to a vagueness attack because the pattern of racketeering requirement is not susceptible of precise definition. *Id.* 109 S.Ct. at 2909. Regardless of whether in other circumstances the uncertain reach of the RICO statute might raise problems of constitutional dimension, we find that the statute is perfectly clear as applied to appellants' conduct and therefore reject their vagueness challenge.[15]

In *H.J., Inc.,* a class of telephone customers sued Northwestern Bell under RICO's civil liability provisions, 18 U.S.C. §§ 1964(a) and (c), alleging that the defendant company had engaged in a scheme to bribe members of a state public utility commission to obtain favorable rate rulings. The Court of Appeals for the Eighth Circuit affirmed the district court's dismissal of the complaint under Fed.R.Civ.P. 12(b)(6) on the ground that the plaintiffs' allegation of a single unlawful scheme did not satisfy RICO's pattern requirement, which it held requires proof of multiple schemes. 829 F.2d 648, 650 (8th Cir.1987), *aff'g,* 648 F.Supp. 419 (D.Minn.1986). The Supreme Court reversed, holding that a RICO pattern may be predicated upon a single criminal scheme as long as sufficient indicia of continuity are present. 109 S.Ct. at 2902.

The Court explained that RICO's legislative history indicates that a pattern of racketeering must be based upon related predicates which "amount to or pose a threat of continued criminal activity." *H.J., Inc.,* 109 S.Ct. at 2900 (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). However, while the Court conceded the difficulties inherent in formulating a precise standard for the continuity requirement, it rejected the defendant's contention that the requirement can be satisfied only through proof of multiple criminal schemes. *Id.* 109 S.Ct. at 2901. According to the Court, evidence of multiple schemes is highly probative of the continuous nature of the defendant's criminal conduct but is not a necessary element of a RICO pattern. Under *H.J., Inc.,* a pattern also may be established through proof that predicate acts forming a single criminal scheme were "a regular way of conducting defendant's ongoing legitimate business," such that absent intervention, they were likely to extend into the future, or through proof that a series of related predicates in fact extended over a "substantial period of time." *Id.* at 2902. As the Court suggested, in view of the variety of ways that continuity may be established, defining a RICO pattern necessarily is a highly fact specific task.

Justice Scalia, in his concurrence, felt that the Court's "murky discussion" failed to provide sufficient guidance as to the outer boundaries of a RICO pattern. *Id.* at

---

**14.** The appellants have invoked Fed.R.App.P. 28(i) to incorporate in part each others' arguments so when we indicate that a particular appellant has made an argument we do not imply that the others have not done so.

**15.** The government believes that appellants' constitutional attack is controlled by *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 109 S.Ct. 916, 924–25, 103 L.Ed.2d 34 (1989), in which the Supreme Court held that the Indiana RICO statute was not unconstitutionally vague as applied to obscenity predicate offenses. The Court pointed out that because the "RICO statute totally encompasses the obscenity law, if the latter is not unconstitutionally vague, the former cannot be either." *Id.* 109 S.Ct. at 925.

The government asserts that in view of *Fort Wayne Books,* a court confronted with a vagueness challenge to the federal RICO statute should look to whether the charged predicate acts are unconstitutionally vague. If they are not, then the vagueness challenge must fail. According to the government, appellants' vagueness argument can be easily rejected because no reasonable argument could be made that the predicate acts charged in this case—murder, gambling, and extortion—are unconstitutionally vague.

While we do not disagree with the government's interpretation of *Fort Wayne Books,* we believe that the appellants' primary contention is that the relationship plus continuity test for a pattern of racketeering under RICO is unconstitutionally vague. This question *does not* hinge on the constitutionality of the charged predicate offenses. Thus, *H.J. Inc.* is more pertinent than *Fort Wayne Books* to our discussion.

2908 (Scalia, J., concurring). In particular, as pertinent to this appeal, he wrote:

> No constitutional challenge to this law has been raised in the present case, and so that issue is not before us. That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

*Id.* at 2909.

Predictably, appellants seize upon this language in arguing that the RICO pattern requirement is so vague as to offend due process.

■ A statute is unconstitutionally vague when it "either forbids or requires the doing of an act in terms so vague that men of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See also Rode v. Dellarciprete*, 845 F.2d 1195, 1199 (3d Cir.1988); *Aiello v. City of Wilmington*, 623 F.2d 845, 850 (3d Cir.1980). However, outside the First Amendment context, a party has standing to raise a vagueness challenge only insofar as the statute is vague as applied to his or her specific conduct. *New York v. Ferber*, 458 U.S. 747, 767–69, 102 S.Ct. 3348, 3360–61, 73 L.Ed.2d 1113 (1982); *Rode*, 845 F.2d at 1200.[16] As stated in *Ferber*, this standing requirement "reflects two cardinal principles of our constitutional order: the personal nature of constitutional rights, ... and prudential limitations on constitutional adjudication." 458 U.S. at 767, 102 S.Ct. at 3360.

In light of *Ferber*, our inquiry must focus on whether persons of ordinary intelligence would know that the repeated commission of murder, extortion, illegal gambling, and usury offenses in furtherance of an organized crime enterprise constitute a pattern of racketeering under RICO. If so,

then we need not further consider whether the pattern requirement is unconstitutionally vague as applied to the hypothetical conduct of third parties not before us, as appellants lack standing to assert the rights of those third parties.

As applied to the appellants' criminal activities, the "relationship plus continuity" test for a pattern is readily satisfied. The criminal conduct involved here was not isolated but extended over a substantial time, and the predicate acts cannot fairly be characterized as unrelated as they were committed pursuant to the orders of key members of the enterprise in furtherance of its affairs. Indeed, the independent existence of the enterprise connotes continuity and relatedness because the evidence showed overwhelmingly that the criminal agenda of the enterprise extended beyond the commission of any individual predicate acts: one joined LCN not to commit any one set of crimes but in fact to commit any crime that the boss wanted done. *See United States v. Indelicato*, 865 F.2d 1370, 1384 (2d Cir.) (en banc), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989) ("[I]f the racketeering acts were performed at the behest of an organized crime group, that fact would tend to belie any notion that the racketeering acts were sporadic or isolated."). In sum, appellants' argument that they lacked notice that their conduct constituted a "pattern" under RICO is utterly devoid of merit, as they have engaged in a classic pattern· of racketeering under RICO.

The result reached here is consistent with *United States v. Angiulo*, 897 F.2d 1169 (1st Cir.1990), which held that, however vague the statute may be as applied to legitimate businesses, its application to the criminal activities of organized crime families is so clear as to be beyond peradventure. *Id.* at 1180 ("A person of ordinary intelligence could not help but realize that illegal activities of an organized crime family fall within the ambit of RICO's pattern

---

**16.** Facial challenges to statutes which implicate First Amendment interests have been permitted because, in such cases, the very existence of an overly broad or vague statute could have a chilling effect on protected expression. *Ferber,* 458

U.S. at 769–70, 102 S.Ct. at 3361. However, even in the First Amendment context, facial invalidation of a federal statute is "'strong medicine'" which should be employed "'only as a last resort.'" *Id.* (citation omitted).

of racketeering activity."). *See also* Freeman, Jr. and McSlarrow, *RICO and the Due Process "Void for Vagueness" Test,* 45 Bus.Law. 1003, 1009 (1990) (suggesting that the vagueness problem identified in *H.J. Inc.* may be more pronounced in civil RICO cases than in criminal prosecutions because private plaintiffs are not politically accountable for their exercise of prosecutorial discretion). We think it is clear that the potential due process problems noted by Justice Scalia in *H.J., Inc.* are not present in organized crime cases. Unlike in *H.J., Inc.,* which involved allegations of corruption within the ranks of a legitimate business, the application of RICO to the activities of the Scarfo crime family could not have come as a surprise to the members of the family. In fact, we have doubts that a successful vagueness challenge to RICO ever could be raised by defendants in an organized crime case. Certainly appellants' attempt to do so has been singularly unpersuasive.

## B. SUCCESSIVE PROSECUTIONS

### 1. *Dual Sovereignty: Successive Prosecutions for the Falcone and Testa Murders*

■ Prior to the trial in this case, Scarfo was tried and acquitted in a New Jersey state court for the murder of Vincent Falcone. Likewise, Scarfo, Scafidi, Salvatore Merlino, Joseph Punigitore, Francis Iannarella Jr., Salvatore Wayne Grande, Charles Iannece and Joseph Grande were jointly tried and acquitted in Pennsylvania in the Court of Common Pleas for the murder of Salvatore Testa. The Falcone murder was charged as racketeering act 3 and the Testa murder was charged as racketeering act 12 in the RICO indictment. Appellant Iannarella brought an unsuccessful pretrial motion, joined in by several other appellants, to have both racketeering acts struck

from the indictment on double jeopardy grounds. Jt.App. at 528. On appeal, Scafidi and Scarfo revisit this issue, arguing that, in view of their acquittals in state court, double jeopardy principles precluded the government from charging the Falcone and Testa murders as predicate offenses. Brief for Scafidi at 9–14; Brief for Scarfo at 17–22.

This argument is contrary to a long line of Supreme Court cases which have held that a federal prosecution arising out of the same facts which had been the basis of a state prosecution is not barred by the double jeopardy clause. *United States v. Wheeler,* 435 U.S. 313, 320, 98 S.Ct. 1079, 1084, 55 L.Ed.2d 303 (1978); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *United States v. Lanza,* 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922). *See also Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (due process clause does not prohibit a state from prosecuting a defendant for the same act for which he was acquitted in federal court). The "dual sovereignty" doctrine rests on the premise that, where both sovereigns legitimately claim a strong interest in penalizing the same behavior, they have concurrent jurisdiction to vindicate those interests and neither need yield to the other.[17]

■ The dual sovereignty doctrine has been interpreted by this court and others to mean that an acquittal in state court does not preclude the government from charging the offense subject to the acquittal as a predicate act in a subsequent RICO prosecution. *United States v. Licavoli,* 725 F.2d 1040, 1047 (6th Cir.), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *United States v. Russotti,* 717 F.2d 27 (2d Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *United States v. Frumento,* 563 F.2d 1083

17. The Court explained in *Lanza:*
 We have here two sovereignties, deriving power from different sources, capable of dealing with the same subject-matter within the same territory ... Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.

 It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.
 260 U.S. at 382, 43 S.Ct. at 142.

(3d Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). In *Frumento,* which involved successive prosecutions for bribery and racketeering, we observed that the federal interest in prosecuting a RICO offense is significantly different than the state interest in prosecuting the predicate offenses:

> [T]he appellants' conduct, even though it may have involved the same operative facts considered in the state court, also contains an additional element of significance to the federal courts though not the state court—the effect of their state operation on interstate or foreign commerce through a pattern of racketeering activity.

*Frumento,* 563 F.2d at 1088.

In view of the lack of congruity between the federal and state interests in the defendants' activities, we held that the double jeopardy clause was no bar to the RICO prosecution, as the case fell squarely within the dual sovereignty doctrine. *Id.*[18]

*Frumento,* of course, is controlling precedent in this Circuit and, absent in banc review, we are constrained to follow it.[19] *See* Internal Operating Procedures, Chapter 9.1 (1990). Appellants, however, insist that this case warrants an exception to the *Frumento* rule because here, the degree of federal and state cooperation in the two prosecutions was so extensive as to cast doubt on the premise that they in fact were brought by separate sovereigns acting independently. Relying on *Russotti,* 717 F.2d at 31, and *United States v. Aleman,* 609 F.2d 298, 309 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980), they argue that the dual sovereignty doctrine is not unqualified but is subject to an exception where the federal authorities are so intimately involved in the state prosecution that it would be fundamentally unfair to allow them to bring a separate prosecution.

Even if we were to follow *Russotti* and *Aleman* in this regard, we would have no basis for applying the exception in this case.[20] Apparently, there was a considera-

---

**18.** In *Frumento,* we recognized that the defendants' argument might better be construed as a collateral estoppel claim, as their "contentions depend[ed] upon their acquittal rather than their conviction in state court." *Id.* at 1088 n. 11. Likewise, the appellants here implicitly have raised a collateral estoppel argument without expressly urging us to apply the doctrine. However, even if appellants had been less equivocal about this point, we would hold that collateral estoppel does not apply to successive prosecutions by different sovereigns. *United States v. Brown,* 604 F.2d 557, 559 (8th Cir.1979); *Turley v. Wyrick,* 554 F.2d 840, 842 (8th Cir.1977), *cert. denied,* 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978); *United States v. Fernandez,* 497 F.2d 730, 747 n. 10 (9th Cir.1974) (Hufstedler, J., concurring) (although the collateral estoppel doctrine "broadened the impact of the double jeopardy clause, it only affected relitigation of an issue between 'the same parties.' ") (quoting *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1975).

**19.** In *United States v. Grimes,* 641 F.2d 96, 100–04 (3d Cir.1981), we questioned the wisdom of the dual sovereignty doctrine because it has been "rigidly applied" and we thought that the continued viability of its jurisprudential basis was somewhat unclear. However, we nevertheless applied the doctrine, as we recognized that the proper forum for its reconsideration is the Supreme Court, which has given no indication

that it intends to abandon its precedents. *Id.* at 104. Thus, *Grimes* in no way limited our holding in *Frumento.*

Joseph Pungitore has argued that the Court's recent decision in *Grady v. Corbin,* — U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), suggests that it may be prepared to reexamine and reject the dual sovereignty doctrine. Thus, he urges us to anticipate this change in the law and consider the double jeopardy implications of the successive murder-racketeering prosecutions, notwithstanding the involvement of different prosecuting sovereigns. We do not detect any such message in *Grady* and in any event, we must adhere to existing law until the Supreme Court sees fit to change it.

**20.** We are not to be understood as suggesting that there should be a qualification on the dual sovereignty doctrine when the federal prosecutors are intimately involved in the state proceeding. In practice a bright line test based on the identity of the prosecuting sovereigns may be required, as a more flexible test considering the degree of federal-state cooperation may not be workable. Furthermore, regardless of the degree of cooperation between the prosecutors, the fact remains that the separate prosecutions vindicate the authority of different governments. Here, however, there is no factual predicate for applying an exception to the dual sovereignty doctrine on the basis of federal-state cooperation. Thus, we have no reason to make

ble amount of federal-state cooperation in the scheduling of the D'Alfonso murder and federal racketeering trials, but appellants have not pointed to anything in the record to substantiate their claim that federal authorities had any involvement in the Falcone and Testa murder trials. Accordingly, we conclude that appellants' previous acquittals for the Falcone and Testa murders do not provide us with reason to disturb their RICO convictions on double jeopardy grounds.

## 2. Successive Federal Prosecutions of the Rouse Extortion

Scarfo has been the defendant in numerous federal prosecutions. Before the indictment issued in this case, we affirmed his conviction under 18 U.S.C. §§ 2 and 1951 for conspiring to extort and extorting $1 million from a real estate developer, Rouse & Associates, in exchange for the cooperation of Councilman Leland Beloff in securing the passage of a zoning ordinance needed for Rouse's completion of a redevelopment project on the Philadelphia waterfront. *United States v. Scarfo,* 850 F.2d 1015 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). However, in a separate trial, he was acquitted of charges that he conducted a continu-

ous criminal enterprise (CCE), in violation of 21 U.S.C. § 848. *United States v. Scarfo,* E.D.Pa., No. 87–258.

 He asserts that this RICO prosecution infringed his rights under the double jeopardy clause because the Rouse extortion offense forming the basis for his earlier conviction was charged as a predicate offense in the instant indictment.[21] He also suggests that his due process rights were violated by the successive prosecutions of the Rouse extortion and the CCE and RICO offenses in federal court, and the Testa and Falcone murders in state court because the government had knowledge of all of the offenses at the time of the first indictment and could have charged all of them at that time. According to Scarfo, the government purposefully brought successive prosecutions in order to embarrass and harass him and exhaust his economic resources to defend himself. Scarfo's Reply Brief at 10.

This argument with respect to double jeopardy on the facts cannot possibly be accepted. The Rouse extortion was only one of the 32 predicate acts which the jury found that Scarfo had committed. Thus, even if we deleted the Rouse act, we would affirm the convictions. *See United States*

a definitive determination of whether there is any qualification on the doctrine.

**21.** The government states that the successive CCE and RICO prosecutions have no double jeopardy implications because none of the predicates supporting the CCE indictment were included as predicate acts in this RICO prosecution. Although Scarfo has not challenged this assertion, we have independently examined the CCE indictment and are satisfied that the successive CCE and RICO prosecutions did not violate the double jeopardy clause.

We note that the government's representation was not entirely accurate, as the attempted murder of Steven Vento, charged here against Scarfo as racketeering act 14, was listed in the CCE indictment as an overt act supporting a conspiracy charge under 21 U.S.C. § 846, which in turn was incorporated by reference in a separate count alleging the CCE offense. Assuming that evidence concerning Vento's attempted murder in fact was introduced at the CCE trial, we do not think that this slight overlap between the proof offered to established the RICO and CCE and section 846 conspiracy offenses subjected

Scarfo to double jeopardy. In the CCE case, it is clear from the indictment that any such evidence would have been offered to demonstrate the manner in which various groups allegedly engaged in drug trafficking interacted with each other whereas in this case, it was offered to prove how the affairs of the RICO enterprise were conducted. As explained in *Grady v. Corbin,* ── U.S. ──, 110 S.Ct. 2084, 2093, 109 L.Ed.2d 548 (1990), the double jeopardy clause does not preclude the government from relying on the same evidence to prove successively charged offenses. It only operates as a bar to proof of the same conduct and then, only in certain circumstances. *Id. See infra* at 1109–11.

Finally, we observe that appellants Salvatore Merlino, Francis Iannarella, Charles Iannece and Ralph Staino also were indicted in the CCE case. However, they do not raise specific arguments on this point but instead, have adopted Scarfo's arguments. Assuming that these appellants were separately prosecuted for the offenses charged in the CCE indictment, based on our comparison of the indictments, we conclude that the double jeopardy claim is no more compelling as applied to their cases.

*v. Riccobene,* 709 F.2d 214, 228 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). In any event, Scarfo's arguments on this point are controlled by binding precedent in this Circuit.

In *United States v. Grayson,* 795 F.2d 278 (3d Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987), we held that prosecution for a RICO offense after an earlier conviction in federal court for a predicate offense is permissible under the double jeopardy clause. We began our analysis in *Grayson* with the observation that RICO's language and legislative history clearly evince Congress's intent to allow separate prosecutions and cumulative punishment of predicate offenses and RICO offenses. *Id.* at 283.[22] In view of that observation, we went on to consider whether such separate prosecutions are constitutional under the double jeopardy clause. We decided that a RICO offense "is not, in a literal sense, the 'same' offense as one of the predicate offenses," as a RICO violation requires proof of a "pattern of racketeering" and is intended to deter continuous criminal conduct. *Id.* In contrast, the predicate offenses are intended to deter discrete criminal acts, in *Grayson,* individual narcotics violations. Accordingly, we held that the double jeopardy clause does not bar a subsequent RICO prosecution which is based, in part, on predicate offenses for which the defendant already has been prosecuted. *Accord United States v. Schell,* 775 F.2d 559, 568 (4th Cir.1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 898 (1986);[23] *United States v. Licavoli,* 725 F.2d at 1049–50. In view of *Grayson,* the inclusion of the Rouse extortion as a predicate offense in the RICO charges was consistent with the double jeopardy clause, notwithstanding Scarfo's previous conviction for that extortion.[24]

**22.** In *Grayson,* the defendant had two prior convictions for federal offenses, one for conspiracy to manufacture methamphetamine and the other for conspiracy to manufacture phencyclidine, both of which were listed as predicate acts in separate counts charging RICO and CCE offenses. 795 F.2d at 282.

**23.** In *Schell,* which involved successive prosecutions for a narcotics conspiracy and a RICO conspiracy, the court reasoned that the defendant had not been subjected to double jeopardy because the two conspiracies had different objectives and different elements. Whereas to prove the RICO conspiracy, the government had to show "the existence of an enterprise and an overt act," to prove the predicate conspiracy, "all that needed to be proved was an agreement between [the defendant] and another to commit a narcotics offense." 775 F.2d at 568.

**24.** *Grayson* also controls Joseph Pungitore's claim that his consecutive sentences under Counts 1 and 5 for RICO conspiracy and for conspiring to distribute methamphetamine subjected him to double jeopardy. *See* Brief for J. Pungitore at 44. Pungitore correctly asserts that cumulative sentences may be treated differently under the double jeopardy clause than successive prosecutions. *Ohio v. Johnson,* 467 U.S. 493, 500, 104 S.Ct. 2536, 2541, 81 L.Ed.2d 425 (1984). However, in addition to upholding the constitutionality of successive prosecutions for RICO offenses and underlying predicate offenses, *Grayson* decided that a RICO sentence may run consecutively to an existing sentence for a charged predicate offense. *Grayson,* 795 F.2d at 286 ("Congress intended to permit the imposition of cumulative sentences for both RICO offenses and the underlying predicate offenses").

Pungitore argues that *Grayson* does not apply because that case involved consecutive sentences for a substantive RICO offense and a predicate conspiracy whereas here, he has challenged his consecutive sentences for a RICO conspiracy offense and a separately charged predicate conspiracy. We see no principled way to distinguish this case from *Grayson.* The legislative intent to permit cumulative punishment for RICO and for underlying predicate acts was not confined to offenses under section 1962(c). Indeed, other courts have approved consecutive sentences for RICO conspiracies and predicate conspiracies for reasons similar to those asserted in *Grayson. United States v. Kragness,* 830 F.2d 842, 863–64 (8th Cir.1987); *United States v. Mitchell,* 777 F.2d 248, 264 (5th Cir.1985), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986).

In a similar vein, various appellants argue vigorously that the settled principle of Wharton's Rule is violated when the predicate offense to a RICO conspiracy charge is itself a conspiracy, rendering it inappropriate for the sentences to be cumulated. This argument also is foreclosed by *Grayson* because the predicate offense there was a conspiracy. We acknowledge that *Grayson* did not discuss the Wharton's Rule issue, but its failure to do so does not diminish its precedential effect in this Circuit. *See also Iannelli v. United States,* 420 U.S. 770, 782, 95 S.Ct. 1284, 1292, 43 L.Ed.2d 616 (1975) (Wharton's Rule limited by statutory intent.)

Scarfo has urged us to reconsider the double jeopardy implications of successive prosecutions for predicate offenses and RICO offenses in light of the Supreme Court's recent decision in *Grady v. Corbin,* — U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which, in his view, implicitly overruled *Grayson.*[25] We believe that Scarfo reads *Grady* too broadly, as the reasoning in that decision logically extends only to offenses arising from a single discrete event. We do not think that the Supreme Court meant to imply that the double jeopardy clause forecloses successive prosecutions in cases of compound-complex felonies such as RICO, which involve several criminal acts occurring at different times in different places.

In *Grady,* the government sought to prosecute the defendant on homicide and assault charges stemming from a fatal automobile collision, after he had pleaded guilty to two misdemeanor traffic offenses arising from the same incident, driving while intoxicated and failing to keep to the right of the median. At the time the guilty pleas were received, the court was not informed that the collision had resulted in a fatality. 110 S.Ct. at 2088. A few weeks later, the court imposed minimum sentences for the offenses pursuant to the recommendation of an assistant district attorney who was unaware that another member of the District Attorney's Office was gathering evidence for the homicide prosecution. *Id.* at 2089. After the defendant was indicted on the homicide and assault charges, the prosecution filed a bill of particulars which identified three reckless or negligent acts upon which it would rely in proving its case: 1) operating a motor vehicle while intoxicated; 2) failing to keep to the right of the median; and 3) driving at a speed too fast for the weather and road conditions. *Id.*

The Supreme Court held that the double jeopardy clause barred the homicide and assault prosecution to the extent that the state, to establish essential elements of the offenses charged in the prosecution, would endeavor to prove conduct for which the defendant already had been prosecuted. *Id.* at 2093.[26] The Court acknowledged that under the test of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the misdemeanor traffic offenses were not the "same offense" as homicide or assault, as each required proof of facts which the others did not. 110 S.Ct. at 2092–93. However, it decided that, in cases of multiple prosecutions, the double jeopardy clause requires more than a technical comparison of the statutory elements of the successively charged offenses. *Id.* Thus, under *Grady,* even if the offense charged in the sec-

---

25. *Grady v. Corbin* was decided May 29, 1990, after oral argument in this case. We invited the parties to submit to us supplemental memoranda indicating what impact, if any, *Grady* might have on the issues raised in this appeal. Our discussion herein is informed by the memoranda we received in response to our invitation.

26. Justice Scalia, in dissent, predicted that the "practical effect" of the holding in *Grady* would amount "to a requirement that where the charges arise from a 'single criminal occurrence, episode, or transaction,' they 'must be tried in a single proceeding.' " 110 S.Ct. at 2102 (Scalia, J., dissenting) (quoting *Brown v. Ohio,* 432 U.S. 161, 170, 97 S.Ct. 2221, 2228, 53 L.Ed.2d 187 (Brennan, J., concurring)). However, the majority viewed its holding as much narrower. Justice Brennan, writing for the majority, expressly stated that *Grady* should not be construed as adopting the "same transaction" test for double jeopardy claims he had urged the Court to embrace in *Brown v. Ohio* and other cases. 110 S.Ct. at 2094 & n. 15. In fact, Justice Brennan opined that even on the facts of *Grady,*

the state would be free to institute a homicide prosecution as long as it confined its proof of the defendant's reckless or negligent conduct to his driving at a speed too fast for weather conditions, the third theory of prosecution identified in the government's bill of particulars. *Id.*

We find it significant that the *Grady* majority so carefully confined its holding so as not to preclude the government from basing later prosecutions on the 'same criminal transaction' upon which the defendant's earlier conviction rests. While this, in itself, does not definitively rule out the possible application of *Grady* in the present circumstances, it does mean that by its own terms, *Grady* would not absolutely bar the government from instituting a RICO prosecution even if it relied solely on a series of criminal transactions which had been the focus of previous trials involving the defendant. This, to us, suggests that *Grady* did not transform double jeopardy jurisprudence to the extent that Scarfo thinks it did.

ond prosecution survives the *Blockburger* test, the prosecution will be barred if the state intends to prove beyond a reasonable doubt the same conduct forming the basis of the earlier conviction.

We realize that the language employed by the Supreme Court in its formulation of the "same conduct" test could be interpreted as extending double jeopardy protection to all situations where the government intends again to prove conduct constituting an offense subject to an earlier conviction. But we would not be justified in reading *Grady* so expansively. The Court in *Grady* relied substantially on *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980)[27] and *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977),[28] the holdings of which implicitly were confined to situations involving discrete criminal events. Indeed, in *Brown*, the Court indicated that its holding, that a prior conviction for a lesser included offense bars a subsequent prosecution for the greater offense, was required by the insular natures of the offenses charged in the two prosecutions, joyriding and auto theft: "The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of *dividing a single crime into a series of temporal or spatial units.*" *Id.* at 169, 97 S.Ct. at 2227 (emphasis added).

The double jeopardy analysis in *Brown* and *Grady*, its most recent progeny, cannot easily be transposed to the RICO context because by definition, a "pattern of racketeering" under RICO is made up of "a series of temporal or spatial units." In-stead, we consider the double jeopardy problem posed by the successive prosecutions here to be more closely analogous to that in *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), which rejected a double jeopardy claim based on the government's use of a drug offense for which a conviction had been obtained as a predicate offense in a later prosecution for engaging in a continuous criminal enterprise (CCE), in violation of 21 U.S.C. § 848. The Court in *Garrett* assumed without deciding that under the *Blockburger* test, a predicate narcotics offense is a lesser included offense of a CCE offense, *id.* at 790, 105 S.Ct. at 2417, but nevertheless rejected the defendant's attempt to invoke the rule in *Brown v. Ohio* as bar to the CCE prosecution. The Court stated:

We think there is a good deal of difference between the classic relation of the 'lesser included offense' to the greater offense presented in *Brown*, on the one hand, and the relationship between the [predicate] marihuana offense and the CCE charge involved in this case, on the other. The defendant in *Brown* had stolen an automobile and driven it for several days. He had engaged in a single course of conduct-driving a stolen car. *The very same conduct would support a misdemeanor prosecution for joyriding or a felony prosecution for auto theft, depending only on the defendant's state of mind while he engaged in the conduct in question. Every moment of his conduct was as relevant to the joy-*

---

27. The situation in *Illinois v. Vitale* was practically identical to that in *Grady*, as the state instituted a prosecution for involuntary manslaughter following the defendant's conviction of a traffic offense involving the same automobile collision. Unlike in *Grady*, the state did not concede that in the manslaughter prosecution, it intended to rely on "all of the ingredients necessarily included in the traffic offense." *Id.* at 419, 100 S.Ct. at 2266–67. Accordingly, the Court found no double jeopardy problem. *Grady* began where *Vitale* left off, as the concession missing in *Vitale* was found to be sufficient to sustain the defendant's double jeopardy claim in *Grady*.

28. *Brown v. Ohio* concerned successive prosecutions for joyriding and auto theft arising from a single incident in which the defendant operated an automobile without the owner's permission. The Court held that the double jeopardy clause prohibits prosecution for a greater offense after the defendant has been convicted of a lesser included offense. *Id.* at 168, 97 S.Ct. at 2227. As under the applicable state law, joyriding was a lesser included offense of auto theft, the Court decided that the auto theft prosecution would subject the defendant to double jeopardy. *See also Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (conviction of a greater offense bars subsequent trial for a lesser included offense).

*riding charge as it was to the auto theft charge.*

*Id.* at 787, 105 S.Ct. at 2416 (emphasis added).

After reviewing the defendant's drug trafficking activities, which spanned 5½ years and several states, the Court concluded that the "significant differences" between the facts before it and those in *Brown*

> caution[ed] against ready transposition of the 'lesser included offense' principles of double jeopardy from the classically simple situation presented in *Brown* to the multilayered conduct, both as to time and place, involved in this case.

*Id.* at 789, 105 S.Ct. at 2416.

The Court also considered that the defendant's CCE offense continued past the time he was indicted for the predicate offense, and was unwilling to "force the Government's hand" by compelling it either to withhold prosecution for the predicate offense until it was prepared to seek an indictment for the CCE offense, or to limit the scope of the CCE prosecution by bringing it at the time of the indictment for the predicate offense. *Id.* at 790, 105 S.Ct. at 2417.

We conclude that *Grady*, which finds its roots in "single transaction" cases such as *Brown*, is no more applicable in the instant circumstances than *Brown* was in *Garrett.*[29] It is true that to the extent of the Rouse extortion, the government proved the "same conduct" needed to sustain the guilty verdict in the Rouse extortion trial. However, as was the case with the CCE offense in *Garrett*, Scarfo's RICO offense was far more extensive than the Rouse extortion. Moreover, Scarfo's racketeering activities continued after his indictment on January 5, 1987, for the Rouse extortion. The evidence showed that the RICO conspiracy extended to October, 1987 and that at least one of the predicate of-

fenses supporting Scarfo's RICO convictions, his participation in the illegal sports bookmaking business, continued through April, 1987. As the Supreme Court observed in *Garrett*, "[o]ne who insists that the music stop and the piper be paid at a particular point must at least have stopped dancing himself before he may seek such an accounting." 471 U.S. at 790, 105 S.Ct. at 2417.

Thus, we reject Scarfo's double jeopardy argument on the basis of *Grayson*, in which we decided that successive prosecutions of RICO and its underlying predicates are constitutionally permissible, and *Garrett*, which distinguished single course of conduct crimes, like those in *Brown* and *Grady*, from compound-complex crimes, like those at issue here. However significant *Grady v. Corbin* may prove to be in cases of simple felonies, we are confident that it has nothing whatsoever to do with the compound-complex crimes at issue here.

 Scarfo's argument that his successive prosecutions violated due process also lacks merit.[30] We acknowledge that successive prosecutions may work hardship on the defendant. Also, from the standpoint of judicial economy, it is preferable for the government to consolidate all charges in a single indictment. However, we are not prepared to say that it was a violation of Scarfo's due process rights for the government to charge the offenses in the manner it did. We could not possibly hold that the inclusion of the Falcone and Testa murders as predicate racketeering acts was overreaching on the part of the government, as the earlier murder prosecutions occurred in state court, beyond the control of the United States Attorneys involved in this case. As for the successive federal prosecutions, Scarfo's argument, which might best be characterized as an allegation of prosecuto-

---

**29.** We dismiss out of hand the possibility that *Grady* overruled *Garrett.* If the Supreme Court on such grossly dissimilar facts intended to abandon *Garrett*, we think it would have said so. Instead, both the majority and the dissent in *Grady* cited *Garrett* without ever hinting that *Garrett* no longer was good law. 110 S.Ct. at 2091, 2102.

**30.** We observe that Scarfo's "due process" argument also might pertain to Iannece's appeal, as Iannece was found by the jury to have committed the predicate act of the Rouse extortion. But while he was indicted for the extortion, it appears that he was not separately tried for it and, in any event, he does not make a specific argument on this point similar to Scarfo's.

rial vindictiveness, presupposes that the government had available to it all of the evidence adduced in this case at the time of the Rouse and CCE trials and that it would have been practical to try the offenses together. Although at least two of the government witnesses in this case, DelGiorno and Caramandi also testified at the Rouse trial, *Scarfo*, 850 F.2d at 1017, we have no way of knowing whether other evidence used to convict Scarfo and his co-conspirators was known to the government at the time of the earlier trials. Furthermore, as the government pointed out at oral argument, the CCE trial itself was a large trial which involved 27 defendants. Tr. of Oral Argument at 149. Had the government attempted to prosecute the RICO and CCE offenses together, the cases may have been completely unmanageable.

■ As other courts have pointed out, "[p]rosecutors have traditionally enjoyed discretion in deciding which of multiple charges against a defendant are to be prosecuted or whether they are all to be prosecuted at the same time." *United States v. Cardall*, 885 F.2d 656, 666 (10th Cir.1989). *See also United States v. Becker*, 892 F.2d 265, 269 (3d Cir.1989) (successive prosecutions of two separate drug conspiracies did not constitute harassment); *United States v. Partyka*, 561 F.2d 118, 124 (8th Cir. 1977), *cert. denied*, 434 U.S. 1037, 98 S.Ct. 773, 54 L.Ed.2d 785 (1978). This is not to say that multiple prosecutions may never result in a denial of due process. *See Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) (vindictive prosecution brought in retaliation to defendant's invocation of procedural rights violates due process). However, to raise successfully a due process claim, the defendant must affirmatively establish vindictiveness, as the fact of multiple prosecutions, standing alone, does not prove an abuse of prosecutorial discretion. Considering that Scarfo has pointed to no evidence of prosecutorial abuse but relies solely on the fact of multiple prosecutions and

that, barring double jeopardy problems, a single trial is not a " 'constitutional imperative,' " *Cardall*, 885 F.2d at 666 (citation omitted), we reject Scarfo's final challenge to his successive prosecutions.

### 3. Successive RICO Prosecutions of Joseph Ciancaglini

■ Ciancaglini filed a pretrial motion to dismiss the RICO charges against him on double jeopardy grounds, citing his earlier conviction for a RICO conspiracy involving the same enterprise. *United States v. Riccobene*, 709 F.2d 214 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). We rejected his double jeopardy claim in an earlier appeal, reasoning that the successive RICO charges did not involve the same offense for double jeopardy purposes because they alleged different patterns of racketeering activity occurring over different time periods. *United States v. Ciancaglini*, 858 F.2d 923, 930 (3d Cir.1988).

Ciancaglini now urges us to reconsider our decision in light of the record developed at trial. Specifically, he contends that the government relied on identical evidence in both trials and that it expressly conceded the existence of a single RICO conspiracy, thus shifting its ground from pretrial, where it alleged that it intended to prove the same enterprise but successive conspiracies. Brief for Ciancaglini at 14. In support of these contentions, he points to two intercepted conversations, one dated April 20, 1976, and the other, November 4, 1977, which were introduced at both trials and which the government claimed were necessary to prove the existence of the enterprise.[31] Brief for Ciancaglini at 15–16. In the course of his response to Ciancaglini's objection on relevancy grounds to the admission of the tapes, the prosecutor stated:

> This tape was played ... in the prosecution of-in 1982 of Harry Riccobene, Mr. Ciancaglini and a number of other defendants.... [I]t's a very essential piece of

---

**31.** The parties seem not to have provided us with transcripts of these intercepted conversa-

tions.

evidence. Its coming from the mouths of these very defendants the fact that there is in fact a La Cosa Nostra, that Mr. Scarfo is a participant in this conversation, this is an ongoing conspiracy.

The conspiracy in this case by the indictment begins in April of 1976, a year before this tape-a year and a half before this tape was even made. The very nature of La Cosa Nostra is this is an ongoing criminal enterprise.[32]

According to Ciancaglini, these remarks constitute an admission on the part of the government of a single RICO conspiracy. Therefore, he argues, we are not constrained by our earlier decision because it rested on an assumption that the government intended to prove successive conspiratorial agreements. He further argues that even if we conclude that the developments at trial did not undercut our reasoning in his prior appeal, *Grady v. Corbin, supra,* requires a different analysis.

In *Ciancaglini,* we held that double jeopardy is offended by successive RICO prosecutions only where, under a totality of the circumstances test, there is no material difference between the "enterprise" and the "pattern of racketeering activity" charged in the two indictments. *Id.* at 929. We specifically rejected a double jeopardy analysis for RICO conspiracies which focused solely on whether the indictments alleged the same conspiratorial agreement. 858 F.2d at 928. We reasoned that because a RICO conspiracy is nothing more than an agreement to violate a substantive provision of RICO, the double jeopardy analyses for successive prosecutions under 18 U.S.C. §§ 1962(c) and (d) must be identical where, as here, both charges allege the same enterprise and underlying "pattern of racketeering activity." 858 F.2d at 929. Indeed, it is meaningless to speak of a conspiratorial agreement under RICO without reference to the "enterprise" and "pattern of racketeering activity."

We fully appreciated the fact that this case involved the same enterprise as that charged in *Riccobene.* 858 F.2d at 929. However, we were not troubled by that circumstance because Congress could not possibly have intended that

> a defendant should be prosecuted only once for an ongoing RICO enterprise when, after being convicted of carrying out the enterprise's activities through one pattern, he allegedly continues to carry them out through a separate pattern.

*Id.* at 928-29.

After carefully reviewing the indictments, we concluded that the alleged pattern of racketeering in this case differed substantially from that charged in *Riccobene.* 858 F.2d at 930. Accordingly, we rejected Ciancaglini's double jeopardy claim. *Id.*

Under our reasoning in *Ciancaglini,* the government's reliance on the same evidence adduced in *Riccobene* to establish the existence of the enterprise hardly means that this prosecution subjected Ciancaglini to double jeopardy. Furthermore, we simply do not agree that the government conceded the existence of a single conspiratorial agreement.[33] Thus, the developments at trial do not require us to re-examine our prior decision, as the patterns of racketeering proven in the two RICO prosecutions were distinct. Of course, as Ciancaglini asserts, if our prior decision is inconsistent with *Grady v. Corbin,* we could not rely on it here. But we do not think that *Grady* undermines *Ciancaglini.*

As discussed above in conjunction with Scarfo's double jeopardy claim, *Grady* held that "the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, *the government will prove conduct which constitutes an offense for which the defendant already has*

---

**32.** Ciancaglini alleges that these remarks were made at a pretrial hearing held on August 26, 1988, but has not provided us with the hearing transcript. In our discussion, we will rely on Ciancaglini's quotation, as the government appears to concede its accuracy.

**33.** Of course, in view of our previous decision, any such concession could not give rise to a double jeopardy problem because our holding did not rest on an assumption that the government intended to prove a different conspiratorial agreement.

*been prosecuted."* 110 S.Ct. at 2087 (emphasis added). By its own terms, *Grady* does not bar successive RICO prosecutions of the same defendant where the only common element of the two prosecutions is the enterprise because the enterprise, in itself, is not "conduct ... constitut[ing] an offense for which the defendant already has been prosecuted." First, as the RICO statute requires proof of both an enterprise and a pattern of racketeering activity, *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), the government's proof of the enterprise in the first RICO prosecution could not be considered proof of the conduct giving rise to the offense of which Ciancaglini previously was convicted. We do not think that under *Grady*, there necessarily is a double jeopardy problem whenever there is an overlap between the facts satisfying the elements of the successively charged offenses. *Grady* holds only that the double jeopardy clause bars a subsequent prosecution where, to prove an essential element of the offense charged in that prosecution, the government will relitigate conduct *amounting to* an offense subject to a previous conviction of the defendant.

Second and even more significantly, *Ciancaglini* is fully consistent with *Grady* because an "enterprise" within RICO does not include any conduct element. Although in this case, the enterprise was defined as "a group of individuals associated in fact," Jt.App. at 127A, evidence of the appellants' association was offered not to prove any illegal "conduct" but to prove the existence of the enterprise which, itself, is "an entity." 18 U.S.C. § 1961(4). *See also Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528.[34] We believe that any other construction of the RICO statute would confuse the association giving rise to the enterprise with a conspiracy. It is true that where the enterprise is defined as an association for criminal purposes, proof of the enterprise implicitly may prove an unlawful agreement. However, as the Supreme Court's language in *Turkette* suggests, *see supra* at 1114 n. 34, a RICO enterprise is not a conspiracy. Thus, while *Grady* may bar successive RICO prosecutions where the patterns of racketeering activity charged against the defendant substantially overlap,[35] we do not think that our prior decision conflicts with *Grady*, as the government's proof of the same enterprise was not proof of the same "conduct."[36]

**34.** In *Turkette,* the Supreme Court elaborated on the distinction between a RICO enterprise and the pattern of racketeering through which the enterprise's affairs are conducted:

> In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' *The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.* The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute.... The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates *function as a continuing unit.* The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. *While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.*

452 U.S. at 583, 101 S.Ct. at 2528–29 (emphasis supplied).

**35.** In our prior decision, we detected an overlap in the time periods of the successively charged RICO offenses but concluded that it was "insignificant" because Ciancaglini was not charged with any of the predicate offenses which occurred during the overlap. *Ciancaglini,* 858 F.2d at 929. We do not think that the overlap raises a serious issue under *Grady* because it has nothing to do with any conduct on the part of Ciancaglini. We need not decide whether *Grady* would bar a subsequent RICO prosecution which relied, in part, on a pattern of racketeering activity supporting a previous RICO conviction of the defendant.

**36.** Ciancaglini further suggests that our prior decision is at odds with *Grady* because we focused "on analysis of the legislature's intent as to the unit of prosecution" and under *Grady,* the legislative intent to allow successive prosecutions is not determinative of whether a later prosecution will violate the double jeopardy clause. Ciancaglini misunderstands our prior decision. While we did observe that Congress could not have intended for a prior RICO con-

Moreover, even if we were to interpret *Grady* as implicitly overruling *Ciancaglini*, we would have no cause to disturb Ciancaglini's conviction because his double jeopardy challenge falls squarely within the exception recognized in *Grady* for offenses which had not occurred at the time of the earlier indictment. 110 S.Ct. at 2090 n. 7.[37] In this regard, we reiterate our observation in *Ciancaglini* that all of the racketeering acts charged against Ciancaglini in this RICO prosecution occurred after the indictment was filed in the *Riccobene* case, and many occurred after the *Riccobene* trial began in April of 1982. 858 F.2d at 930. Ciancaglini has argued that the district court's jury instructions in this case amounted to a "quasi-*Pinkerton* charge" which encouraged the jury to look beyond the alleged predicate acts and find guilt based on conduct occurring at the time of the earlier indictment. For reasons explained more fully later in this opinion, we reject this contention. *See infra* at 1147 & n. 91. To us, the fact that completely different patterns of racketeering were proven in the two cases is dispositive of the double jeopardy question raised here. Thus, we reject Ciancaglini's claim.

## C. SENTENCING ISSUES [38]

### 1. *Consecutive Sentences for RICO Conspiracy and Substantive Offenses*

Scarfo, Salvatore Wayne Grande, Frank Narducci, Jr. and Phillip Narducci argue that the double jeopardy clause prohibits consecutive sentencing for RICO conspiracy and substantive offenses, under 18 U.S.C. §§ 1962(c)–(d). They point out that the same evidence was used to convict them of both RICO offenses and that Count 2 of the indictment, which charged

the section 1962(c) offense, incorporated by reference all of the predicate acts charged in Count 1, the section 1962(d) conspiracy offense. Accordingly, they maintain that the consecutive sentences result in multiple punishments for the same offense, in violation of the double jeopardy clause.

The permissibility of consecutive sentencing for RICO conspiracy and substantive offenses is controlled by *United States v. Marrone*, 746 F.2d 957 (3d Cir.1984), which held that a RICO conspiracy does not merge with the substantive offense for purposes of sentencing. We reasoned there that sections 1962(c) and (d) define distinct offenses under the test of *Blockburger v. United States*, 284 U.S. at 304, 52 S.Ct. at 182, as each requires proof of a fact which the other does not. Given that the offenses are distinct and no legislative intent against consecutive sentencing is discernible from RICO's text or legislative history, we inferred that Congress intended to authorize consecutive sentencing. *Marrone*, 746 F.2d at 959. Significantly, *Marrone* expressly rejected a double jeopardy analysis which examined whether the same evidence was used to prove the two offenses. *Id.* at 959. Under *Marrone*, the focus of a double jeopardy analysis of cumulative sentencing is on the legislative intent. Therefore, the fact that in this case, both RICO offenses were predicated upon the same pattern of racketeering is irrelevant.

Appellants urge us to reconsider *Marrone*, as, in their view, it is inconsistent with *Jeffers v. United States*, 432 U.S. 137, 156–57, 97 S.Ct. 2207, 2219–20, 53 L.Ed.2d 168 (1977), and subsequent Supreme Court decisions. Absent in banc review, we are constrained by *Marrone*, as that case

viction to insulate a defendant from a subsequent RICO prosecution based on a different pattern of racketeering activity, our decision rested on our comparison of the patterns of racketeering charged in the two indictments.

**37.** In *Grady*, the Court reaffirmed that "when application of ... traditional double jeopardy analysis would bar a subsequent prosecution, '[a]n exception may exist where the State is unable to proceed on the more serious charge at the outset because additional facts necessary to

sustain that charge have not occurred or have not been discovered despite the exercise of due diligence.'" 110 S.Ct. at 2090 n. 7 (quoting *Brown v. Ohio*, 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7).

**38.** We have considered and rejected Joseph Pungitore's double jeopardy challenge to his consecutive sentences under Counts 1 and 5 for RICO conspiracy and for conspiring to distribute methamphetamine. *See supra* at 1108 n. 24.

squarely decided that sections 1962(c) and (d) define separate offenses for sentencing purposes. However, even if we could relax our rules, we would adhere to *Marrone* as we believe it was correctly decided.

*Jeffers* held that principles of double jeopardy bar cumulative punishment for engaging in a continuous criminal enterprise in violation of 21 U.S.C. § 848 and for a conspiracy under 21 U.S.C. § 846 predicated upon the same facts. In examining the double jeopardy implications of cumulative fines imposed upon the defendant, the Supreme Court drew largely upon its prior determination that a conspiracy within section 846 is a lesser included offense of a section 848 offense. *Id.* at 149–50, 97 S.Ct. at 2215–16. In view of that finding, the Court found it necessary to scrutinize closely the legislative intent to ascertain whether Congress nevertheless intended cumulative punishment under the two statutes. *Id.* at 155, 97 S.Ct. at 2218. As Congress did not specifically authorize cumulative punishment, the Court held that it was impermissible. *Id.* at 156–57, 97 S.Ct. at 2219.

The result in *Jeffers* differed from our decision in *Marrone* because the Supreme Court in construing a different statute, discerned a different legislative intent. *Jeffers* does not support appellants' contention that the constitutionality of consecutive sentences depends upon the proof adduced at trial. In subsequent cases, the Court has not suggested otherwise. Instead, it has emphasized that the permissibility of cumulative punishment is a question of legislative intent, which may differ depending on whether the two statutes proscribe the same offense. Thus, in *Whalen v. United States*, 445 U.S. 684, 693, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980), the Court stressed that "where the offenses are the same ... cumulative sentences are not permitted, unless elsewhere specially authorized by Congress." *Accord Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983) (the Double

Jeopardy Clause does not preclude the imposition of consecutive sentences under two statutes proscribing the same offense in cases where the legislative intent to permit such sentencing is "crystal clear.") In contrast, cumulative punishment is *presumptively* valid if the statutes define distinct offenses. *Garrett v. United States*, 471 U.S. at 793, 105 S.Ct. at 2419. As stated in *Garrett*, "[t]he presumption when Congress creates two distinct offenses is that it intends to permit cumulative sentences, and legislative silence on this specific issue does not establish an ambiguity or rebut this presumption." *Id.*

 As recognized in *Marrone*, sections 1962(c) and (d) of the RICO statute define separate offenses under the *Blockburger* test. Unlike the CCE statute examined in *Jeffers*, section 1962(c) does not expressly require concerted activity and therefore a conspiratorial agreement is not an essential element of the offense. Section 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity or the collection of unlawful debt.

18 U.S.C. § 1962(c).

In civil cases involving section 1962(c), we have held that the *enterprise* and *perpetrator* of a substantive RICO offense may not be the same "person," because the legislative intent to "prevent the takeover of legitimate businesses by criminals and corrupt organizations" would not be served if innocent corporations were punished along with the "infiltrating criminals." *B.F. Hirsch v. Enright Refining Co., Inc.* 751 F.2d 628, 633–34 (3d Cir.1984). *See also Rose v. Bartle*, 871 F.2d 331, 358–59 (3d Cir.1989).[39] However, nothing in the statute or our prior decisions suggests that a

---

**39.** In contrast, we have held that under section 1962(a), which makes it unlawful to "use or invest" income derived from a pattern of racketeering activity, the enterprise and perpetrator

need not be distinct entities. *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1361 (3d Cir.1987).

single individual "employed by or associated with an enterprise" could not commit a substantive RICO offense by conducting the enterprise's affairs through a "pattern of racketeering." To the contrary, we have no difficulty perceiving how a single person with the ability to marshall an enterprise's resources to further corrupt endeavors might run afoul of section 1962(c). Therefore, we remain convinced that a substantive RICO offense, unlike a RICO conspiracy, does not require proof of an unlawful agreement. Section 1962(c) obviously requires proof of facts which section 1962(d) does not, as to prove a substantive RICO offense, the government must show that the underlying predicate acts were committed.

We realize that a technical comparison of the statutory elements of the offenses under the *Blockburger* test is not necessarily dispositive of whether cumulative punishment will violate the double jeopardy clause, as the *Blockburger* test is only a rule of statutory construction which has proven to be a useful guide in discerning the legislative intent. *Albernaz v. United States*, 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981). In other words, a determination under the *Blockburger* test that cumulative punishment is permissible cannot override a clear expression of contrary legislative intent. *Id.* However, where, as here, the statutory provisions define separate offenses, under

*Garrett*, we must presume that Congress intended cumulative punishments for them unless it expressly has indicated a contrary intent.[40] Congress has not done so. Accordingly, in keeping with virtually every other court of appeals which has considered this issue,[41] we adhere to our position in *Marrone* that consecutive sentences for RICO substantive and conspiracy offenses are permissible under the Double Jeopardy Clause because they are statutorily authorized.[42]

### 2. Consecutive Sentencing of the Narduccis following state life sentences for the D'Alfonso murder

The Narduccis maintain that the district court erred in making their federal sentences on the RICO charges run consecutively to sentences of life imprisonment imposed on them by the Court of Common Pleas for Philadelphia County following their convictions for the murder of Frank "Flowers" D'Alfonso. Brief for Narducci at 36–42. The state indictment for the D'Alfonso murder apparently was returned before the indictment in this case. Jt.App. at 820, 823. The state murder trial was scheduled to begin in June, 1988, but, for reasons not apparent from the record, was repeatedly continued. Pursuant to an agreement between the federal and state prosecutors, the federal case proceeded to trial first.

---

**40.** Our analysis is not altered by the fact that some of the section 1962(c) acts at issue here were themselves conspiracies. We do not think that Congress intended for the permissibility of consecutive sentences for RICO conspiracy and substantive offenses to vary, depending on the nature of the charged predicate offenses. Our result here is informed by *Grayson* which, as noted *supra*, n. 24, decided that consecutive sentences for RICO offenses and underlying predicate conspiracies are constitutionally permissible.

**41.** *See United States v. West*, 877 F.2d 281, 292 (4th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *United States v. Yarbrough*, 852 F.2d 1522, 1545 (9th Cir.), *cert. denied*, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988); *United States v. Biasucci*, 786 F.2d 504, 515–16 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986); *United States v. Watchmaker*, 761 F.2d 1459, 1477 (11th

Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986). The only court which has not followed suit is the Court of Appeals for the Sixth Circuit. *United States v. Sutton*, 642 F.2d 1001, 1040 (6th Cir.1980) (en banc), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981).

**42.** We note in passing that we do not discern anything in *Grady v. Corbin* to cause us to question this result, as *Grady* was concerned with the double jeopardy implications of multiple prosecutions, which raise entirely different considerations than do consecutive sentences. *See* 110 S.Ct. at 2091. Although the majority and the dissent in *Grady* disagreed as to whether the *Blockburger* test was the exclusive means of defining the "same offense" in the context of multiple prosecutions, neither questioned that, in cases of cumulative punishment, the *Blockburger* test may be determinative. *Id.* at 2091 & n. 8.

On September 8, 1988, before the trial commenced, the government orally moved to have the D'Alfonso murder stricken from the indictment so that the state prosecution could proceed at the conclusion of the federal case.[43] Jt.App. at 823. The motion was granted and the D'Alfonso murder was withdrawn as a predicate act.[44] After the jury's verdict in this case but before sentencing, the appellants were found guilty of first degree murder in the state prosecution and were given life sentences. Consequently, at the sentencing conference in this case, the district court granted the government's motion to amend its presentence report to reflect the state convictions and sentences. As mentioned above, the appellants' federal sentences run consecutively to their life sentences for the D'Alfonso murder.

■ Appellants' primary contention is that the district court erred in imposing consecutive sentences because the state sentences were not "final" at the time of the federal sentencing inasmuch as the time for filing their post-sentence motions had not yet expired. They also suggest that the district court had no authority to order consecutive sentences. Finally, they assert that the imposition of a consecutive federal sentence following a state conviction for a withdrawn predicate act in a RICO prosecution is inconsistent with the Justice Department's *Petite* policy regarding duplicitous federal-state prosecutions.[45] We reject each of these contentions.

■ There is no question that the district court had the discretion to order the federal sentences to run consecutively to the unexpired state sentences. Appellants, relying on *United States v. Terrovona*, 785 F.2d 767, 770 (9th Cir.), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 553 (1986), suggest that under 18 U.S.C. § 4082(a), a district court has no authority to designate whether a federal sentence will run concurrently or consecutively to an existing state sentence but can only make a recommendation to the Bureau of Prisons. Although *Terrovona* did so hold for an offense committed prior to November 1, 1987,[46] insofar as it related to consecutive sentencing, it was contrary to the position taken by a majority of federal appellate courts.

43. Under a Pennsylvania statute, a state prosecution would have been barred if the murder charges were considered as predicate acts in the federal RICO prosecution. 18 Pa.Cons.Stat.Ann. § 111. *Commonwealth v. Ramirez*, 367 Pa.Super. 477, 479–83, 533 A.2d 116, 118–19 (1987) (for purposes of section 111, a state prosecution is barred if there has been a prior determination of the defendant's guilt or innocence in another jurisdiction.). Pennsylvania also has adopted a more restrictive interpretation of the dual sovereignty doctrine than the federal courts. *Commonwealth v. Mills,* 447 Pa. 163, 171, 286 A.2d 638, 642 (1971) (a completed federal prosecution bars the state from prosecuting the same conduct unless the state and federal interests are "substantially different.").

44. Defense counsel for several appellants asserted various reasons why the government should not have been permitted to withdraw the charge. For example, Scarfo's attorney argued that because the government proposed to withdraw the charge without prejudice, its ulterior motive was to save a predicate act for use in a subsequent RICO prosecution which would be brought if jury failed to convict in this case. Jt.App. at 810. Ciancaglini's attorney, taking a different approach, argued that while withdrawal of an entire count might be permissible, withdrawal of a single predicate act would constitute an unconstitutional amendment of the indictment. Jt.App. at 816–17. Neither of these arguments are renewed on appeal and, in any event, neither are pertinent to the sentencing issue before us.

45. Appellants also argue that consecutive sentencing for the federal and state offenses offends the double jeopardy clause. We reject this contention on the basis of *United States v. Grayson,* 795 F.2d at 283, which held that consecutive sentencing for a RICO offense and a separately charged predicate offense is constitutional under the Double Jeopardy Clause. *See supra* at 1107–08. Furthermore, the argument is inconsistent with the dual sovereignty principles we discussed in conjunction with appellants' challenge to the successive federal-state prosecutions of the Falcone and Testa murders. *See supra* at 1105–07.

46. In the case of offenses committed after November 1, 1987, the statute expressly authorizes the district court to order concurrent sentences. 18 U.S.C. § 3584(a). Of course, we are not concerned with section 3584(a) here because this case involves consecutive as opposed to concurrent sentencing and in any event, the appellants' RICO offenses were completed in October, 1987. Jt.App. at 128A.

Section 4082(a) provides with respect to offenses committed prior to November 1, 1987, that:

A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served.

This provision has been construed to mean that the Attorney General has sole authority to designate the place of confinement in cases where the federal and state sentences are to run concurrently. *Salley v. United States,* 786 F.2d 546, 548 (2d Cir. 1986); *United States v. Thornton,* 710 F.2d 513, 515–16 (9th Cir.1983); *United States v. Janiec,* 505 F.2d 983, 987 (3d Cir.1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975). However, it is well settled that a federal court has the power to direct that a federal sentence will run consecutively to an unexpired state sentence. *Salley,* 786 F.2d at 547; *United States v. Campisi,* 622 F.2d 697, 699 (3d Cir.1980); *United States v. Lee,* 500 F.2d 586 (8th Cir.), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 322, 42 L.Ed.2d 279 (1974); *Anderson v. United States,* 405 F.2d 492 (10th Cir.), *cert. denied,* 394 U.S. 965, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). As under 18 U.S.C. § 3568, for offenses committed prior to November 1, 1987, a federal sentence does not begin to run until the defendant is delivered to the place where the sentence is to be served,[47] a district court's imposition of a consecutive federal sentence in no way encroaches upon the authority of the Attorney General under section 4082(a) to "designate the place of confinement." He simply will not

be called upon to do so until the state sentence is completed and the defendant is delivered to federal custody.

Appellants nevertheless argue that consecutive federal sentences are precluded where the state sentences are not final at the time of the federal sentencing. They point to Rule 359 of the Pennsylvania Rules of Criminal Procedure, which provides that in cases where the death penalty or a mandatory sentence is authorized by law, the court may immediately impose the sentence but that the sentence becomes final for purposes of appeal only after all post-sentence motions are decided.[48] They assert that because they filed post-sentence motions which at the time of the federal sentencing had not yet been resolved by the state trial court, under Rule 359, the state sentences were not yet final.[49] Brief for Narduccis at 39.

Although we recognize that the imposition of consecutive federal sentences may raise problems when the state sentences have not yet been imposed, *United States v. Eastman,* 758 F.2d 1315 (9th Cir. 1985), we do not believe that the existence of pending post-sentence motions in state court means that the state sentences are not final for purposes of federal sentencing. Subdivision (F) of Rule 359 states that the sentence becomes final "for the purpose of appeal" after the resolution of post-sentence motions. It seems obvious that subdivision (F) was meant to prevent appeals within the state system during the pendency of such motions because their resolution could have a substantive impact on the appeal. As the imposition of a consecutive federal sentence in no way affects the state appellate process, we cannot see

---

**47.** Section 3568 as applicable here provides in pertinent part:

The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence.

**48.** Subsections (A) and (B) of Rule 359 provide that "[i]n cases in which the imposition of death is authorized by law" or in which a "mandatory sentence is provided for by law, upon verdict, [and] the court decides not to impose a sentence

greater than the mandatory," "the court may immediately . . . impose that sentence." Subsection (C) specifies that post-sentence motions must be filed within ten days of sentencing, and subsection (F) provides that "[w]hen the motion is decided, the judgment of sentence shall become final for the purpose of appeal."

**49.** We do not have before us any records from the state court to substantiate this claim. However, we will assume it to be true for purposes of our analysis.

why Rule 359 should preclude consecutive federal sentencing. We are not persuaded by appellants' argument to the contrary.[50]

■ Appellants' remaining contention requires little discussion. They argue that the consecutive sentencing was inconsistent with the Justice Department's *Petite* policy against duplicitous federal-state prosecutions.[51] The *Petite* policy is an internal rule promulgated by the Justice Department that requires federal prosecutors considering a potentially duplicitous prosecution to obtain prior authorization from a Justice official, who decides whether there are "compelling reasons" for pursuing the matter. *Rinaldi v. United States,* 434 U.S. 22, 28–29, 98 S.Ct. 81, 85, 54 L.Ed.2d 207 (1977); *United States v. Manbeck,* 744 F.2d 360, 371 n. 7 (4th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). According to appellants, the *Petite* policy reflects the Justice Department's strong disapproval of successive federal-state prosecutions for the same offense and is broad enough to bar consecutive sentences in cases where the government has withdrawn a predicate act in a RICO prosecution for the sole purpose of cumulating punishments against the accused.

We disagree. First, in view of the substantial state interest in prosecuting appellants for D'Alfonso's murder, and in the absence of any showing by appellants of the prosecutorial motive alleged, we are not persuaded that the prosecutors sought dismissal of the murder as a predicate act solely to cumulate punishments. Second, we have doubts that the *Petite* policy is even implicated in this case, as the federal prosecution preceded the state prosecution

and it is not clear that the policy has any bearing on sentencing issues. Finally, even if the *Petite* policy applies, it does not confer any substantive rights on appellants. *Manbeck,* 744 F.2d at 372 n. 11; *United States v. Hadley,* 671 F.2d 1112, 1116 (8th Cir.1982); *United States v. Chavez,* 566 F.2d 81 (9th Cir.1977). Thus, it affords no basis for a reduction of appellants' sentences.

## D. PROSECUTORIAL MISCONDUCT

Appellants contend that the prosecutors in their rebuttal summation and during the course of the trial, engaged in various types of misconduct warranting a new trial. Specifically, they maintain that the prosecutors vouched for the credibility of their witnesses, attested to their own integrity, made inflammatory references to the appellants, commented on government witnesses' fears that the appellants would retaliate against them for testifying, and mischaracterized the government's burden of proof. While there is no doubt that some of the prosecutors' remarks were very strong, none could qualify as misconduct, and therefore none could justify the granting of a new trial.

### 1. *Improper Prosecutorial Vouching*

Based on our review of the trial transcript, it is clear that the success of the government's case hinged on whether the jury believed the testimony of Thomas DelGiorno and Nicholas Caramandi. The thrust of the defense was to attack DelGiorno's and Caramandi's credibility by drawing attention to their extensive criminal histories, to favorable terms of their

---

**50.** We similarly reject appellants' further suggestion that consecutive sentencing was error because, under Pennsylvania law, sentences are not final until all appeals have been exhausted and the time for a petition for certiorari has elapsed. Brief for Narducci at 39. The cases they cite in support of this proposition both address the retroactive application of statutes enacted and cases decided during the pendency of appeals in criminal cases. *See Commonwealth v. Little,* 432 Pa. 256, 258, 248 A.2d 32, 34 (1968) (violation of defendant's *Miranda* rights may be considered in a nunc pro tunc appeal in a criminal case tried before *Miranda* was decid-

ed); *Commonwealth v. Thomas,* 450 Pa. 548, 553–56, 301 A.2d 359, 363–64 (1973) (defendant was entitled to a reduction of sentence in accordance with new penalty provisions passed during pendency of appeal). These cases do not stand for the broad proposition that sentences in Pennsylvania remain uncertain until all appeals are exhausted. Rather, the holdings in the cases are closely tied to the unique circumstances in which they arose.

**51.** *See Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960).

plea agreements with federal and state authorities, and to prior inconsistent statements they had made at previous trials. All of these were routine impeachment tactics for dealing with turned witnesses. However, defense counsel went further and suggested that federal and state law enforcement officers had fabricated DelGiorno's and Caramandi's testimony.

Apart from accusatory remarks in certain opening statements,[52] throughout most of the trial the defense attorneys' allegations of government misconduct were confined to questions posed during the course of rigorous cross-examination of DelGiorno and Caramandi.[53] However, after the government rested, the appellants called DelGiorno's son, Thomas DelGiorno, Jr., who expressly stated that FBI agents and state law enforcement officers had suggested answers to his father while debriefing him:

> Q: During the period of time you were with your father when he was taken for briefing sessions or to be interviewed by the FBI and/or the State Police, what, if anything, did he say about the manner in which they interviewed him? And let me

be specific about that. What did he say occurred when they asked him to recount or to tell them what they knew about a certain incident? What did he say they'd do?

> A: He told me they would ask him of a certain incident and my father would tell them about the certain incident and the, for instance, *they would come back at him and ask him, well, could it have happened this way and my father would say, yeah, it could have happened that way and then by the time they're done of could it happen this way or could it happen that way, my father was actually telling the story that they wanted him to tell.*

> Q: Did he tell you this himself?

> A: Yes, he did several times.

> Q: And did he make a comment about that, how that interested him or words of that effect?

> A: Yeah, he was very interested in the beginning because he really felt that, he couldn't believe that they would do something like this cause, you know, they're federal government or they're Jersey Po-

---

52. For example, in his opening statement, Philip Leonetti's attorney, after reviewing Caramandi's and DelGiorno's extensive criminal backgrounds, stated the following:

> [T]he government wants Nicky Scarfo and his associates so bad they're willing to accept that type of witness as the backbone and spine of their case.... Now how does this come about? ... Well it comes about this way. They bring these folks into a room, and I'm not blaming these folks here.
> I'm not going to say that these prosecutors participated in it because it goes back a long way. There are other law enforcement agents who bring these guys into a room. And they don't write down what's being said in the room at the time.
> *They go over a set of facts and they say well.... Take it easy, Tommy. This isn't being etched in stone yet. Let's work on it a little bit. Let's get it down right.*
> And they go over it and over it and then they put it down to a piece of paper which is referred to as a 302.... And it's from that that they expect him to testify with precision.
> Tr., 9/29/88 at 37–38 (emphasis supplied).

53. During cross-examination of DelGiorno, defense counsel unsuccessfully tried to elicit his admission that the New Jersey state police supplied answers to him while questioning him:

> Q: [T]hey didn't say to you, Mr. DelGiorno tell us about all the crimes you were involved with, did they? Rather, they said to you, tell us what Mr. Scarfo's involved with, didn't they?
> A: No, they didn't.
> Q: Well, when you started to talk to them, they were *instructive* as to how you were supposed to relay information, weren't they?
> A: I don't know what you mean by instructive.
> Q: Well, they told you that they wanted you to stop thinking that you were on the streets, and start thinking like a cop, remember that?
> A: Yes, I think he meant just—in other words, you just talk and say things that a cop would be interested in knowing.
> Q: Well, is it the things that cops would be interested in knowing, or that *you're supposed to be talking so that you're explaining things in a way which is pleasing to law enforcement.*
> A: No, I don't think he meant pleasing.
> Tr. 10/14/88 at 127–28 (emphasis supplied). Elsewhere during DelGiorno's cross-examination, defense counsel suggested that the prosecutors had advised him to "tone [his] act down for the jury," *id.* at 49, and that his testimony was "not unrehearsed." *Id.* at 175.

lice or they're government, couldn't believe they actually do something like this. But once he did it several times, I guess he got used to it and he just went on from there.

Tr. 11/9/88 at 73–74 (emphasis supplied).

In response to this testimony, the government, as part of its rebuttal case, called several law enforcement officers who had been present during DelGiorno's questioning. The officers refuted Thomas DelGiorno, Jr.'s allegations:

Q: Were you present when the FBI agents interviewed Thomas DelGiorno?

A: Yes, sir, I was.

Q: Did you ever hear any of those FBI agents suggest to DelGiorno that he change the answers that he was giving?

A: No, sir, I did not.

Q: Did you ever hear any of those agents suggest to him that they didn't like his version of the facts and suggested an alternate version of the facts which he could have got, which came from them, the agents, as opposed to from his mouth?

A: No, sir, I did not.

Q: Ever hear anybody suggest to Del-Giorno that he add more defendant [sic] into a particular crime?

A: At no time did I ever hear that, no sir.

Q: Or say that the defendant who hadn't committed a crime should commit, should be testified to by DelGiorno or said to have committed a crime by Del-Giorno?

A: No, sir, I did not.

Tr. 11/9/88 at 164.

In view of these excerpts, it is apparent that at the close of the evidence, the amount of weight the jury would assign to Thomas DelGiorno, Sr.'s testimony depended to a large extent on who the jury found more credible, Thomas DelGiorno, Jr., or

the assorted law enforcement officers who flatly denied his allegations of misconduct.

Predictably, the integrity of the government in maintaining this prosecution became a central theme in the appellants' closing arguments. We need not recount all of the instances where defense counsel attacked the integrity of the government but will limit our discussion to a few of the more extreme examples cited by the government. Joseph Grande's attorney claimed that DelGiorno's and other witnesses' testimony was completely fabricated by the government: "[Y]ou know that [DelGiorno and Caramandi] they're liars, killers, thieves, burglars, flim-flam artists, cheaters, crooks, perjurers.... [T]heir testimony has been colored, it's been nursed, rehearsed, practiced, planned, engineered if you will so that when they testify that they'll appear believable." Tr. 11/15/88 at 26. Philip Leonetti's attorney predicted that DelGiorno and Caramandi would receive lenient sentences because sentencing "is to be at the whim and caprice of the prosecutors, who are going to make representations to the sentencing judge." Tr. 11/12/88 at 117. And finally, Scarfo's attorney opined that the prosecutors did not seriously believe that the appellants would be convicted of all charges,[54] and repeatedly suggested that the government had a vendetta against the Mafia which led it to seek the appellants' convictions at any cost. Tr. 11/16/88 at 142–44. In this regard, he analogized the prosecution of the Scarfo family to the government's attempt to bury unions in the 1930's, the internment of the Japanese during World War II, the blacklisting of communists during the McCarthy era, the circumstances leading to the Kent State riots, the persecution of Vietnam protestors, and ultimately, in his *piece de resistance*, to the Spanish Inquisition. *Id.*[55]

---

**54.** He stated: "The evidence in this case and the way this case is brought it's a given that the prosecution knows that you're not going to convict all of these guys on all of these charges. It's a given, but what they don't expect is that you're going to analyze the evidence and the lack of evidence and come to the conclusion that there's

a reasonable doubt as to all the defendants on all of the charges." Tr. 11/16/88 at 116–17.

**55.** Some of Scarfo's attorney's comments are so memorable as to bear repeating:

What they did [during the Spanish Inquisition], they would take somebody from a group of people that he was friendly with and

Bearing in mind the trial context in which it was made, we turn now to appellants' assault on the prosecutor's rebuttal argument. According to appellants, the prosecutor's vouching took the following forms: 1) references to the "moral integrity" of law enforcement officers and prosecutors working on the case, together with assertions that because the testifying law enforcement personnel had sworn oaths of office, they would be jeopardizing their careers if, as some defense attorneys claimed, they had scripted Caramandi's and DelGiorno's testimony; 2) suggestions that the prosecutors possessed some means of assessing the truthfulness of Caramandi's and DelGiorno's testimony, independent of the evidence presented at trial; and 3) the prosecutors' personal assurances that the witnesses were telling the truth. Brief for J. Pungitore at 13–14.

Appellants point to the following examples of the prosecutor's allegedly improper remarks. In response to defense counsels' claims that FBI agents had scripted DelGiorno's testimony, the prosecutor, in his rebuttal argument, stated:

> Why bring all those FBI agents and state troopers? I'll tell you why. *Because the FBI agents and state troopers in this case are not criminals.* There's no evidence to indicate that they're the criminals. There's no evidence that those *good men* suborned perjury or made up anything and that's why the Government brought them in[,] so that you could judge their credibility from the witness stand.

Tr. 11/16/88 at 175–76 (emphasis supplied).

The prosecutor also urged the jury to consider that the testifying law enforcement personnel had taken oaths of office when assessing the credibility of Thomas DelGiorno, Jr.'s testimony.[56]

Finally, appellants rely on the following passage in support of their claim that the prosecutor attested to the integrity of the prosecutorial team and personally vouched for the credibility of DelGiorno and Caramandi:

> Well, those prosecutors that [defense counsel] was referring to include for the most part us, me, Joe Peters, L[ou]is Pichini, Albert Wicks and Dave Fritchey, who you saw for most of the trial. We're the prosecutors. It's not somebody off in Washington. It's not somebody some place else that you'll never see. We're the ones and make no mistake about it. What he's telling you, what a lot of these defense attorneys are telling you is that we fed this information to those Defendants, and you know what? You've heard us throughout the course of this trial. I'm not a genius but I'm not that dumb that I casually mentioned things to them without knowing exactly what I'm doing. I'm not that stupid. I didn't casually allow Caramandi to know what DelGiorno was saying and allow DelGiorno to know what Caramandi was saying and neither did any of these other prosecutors[,] because they're all at least as smart if not smarter than I am, and you know what? Those FBI agents, those state troopers, those policemen, they're not real stupid either.

> The only way that Caramandi and DelGiorno's testimony could be consistent in

Tr. 11/16/88 at 143–44.

**56.** The prosecutor stated:

> You decide if it was [Thomas DelGiorno, Jr.] that was telling the truth or if it was all those FBI agents and state troopers who swore an oath who many of them told you have been agents and troopers for 19 years, 18 years, 17 years, you decide if they put their jobs, their careers and everything they worked for all those years on the line to fabricate testimony and put words in a witness' mouth, or if Thomas DelGiorno [Jr.] was a liar.

*Id.* at 176.

they would take them down into a basement and they would put him on a rack and they would torture him and torture him until he gave up on his friends, until he said whatever they wanted him to say. He would lie just to get rid of the pain.

Now it's a different ball game. Here in the 80's ... [w]hat they do is they buy them off with hundreds of thousands of dollars, change their identification. You're going to read about DelGiorno and Caramandi maybe 10 years from now doing some other things, but they were bought off. They didn't have to torture them like they tortured people during the Inquisition.

this case is one of two ways. They're either telling the truth or all the prosecutors and law enforcement people or a large percentage of them got together and said to Caramandi, listen, here's what Thomas DelGiorno was telling, the story, here's how he says it and we want you to say it the same way[,] and then we went to DelGiorno and said here's how Caramandi is telling the story. We want you to say it the same way. Now there's been no evidence whatsoever that anything like that happened in this case. *In fact, all those law enforcement people who paraded up on the stand in response to some testimony that was inaccurate by the defense that just wasn't so, all those people said it never ever happened and you've got to ask yourselves if all those law enforcement people and we as prosecutors violated our oaths, jeopardized our jobs, our careers, our right to practice law, they're [sic] right to continue as FBI agents, or there's another alternative.* The stories of Caramandi and DelGiorno coincide because they are telling the truth, because the evidence indicates ... it. ... *[T]he only way that they got their stories together is if law enforcement told them each what to say[,] and there is nothing to indicate that that happened, and it didn't happen.*

Tr. 11/16/88 at 241–43 (emphasis supplied).

The district court in its opinion on appellants' post-trial motions decided that "to the extent that the prosecution bolstered the credibility of its witnesses, it did so as an appropriate response to defense attacks on the integrity of the prosecution." 711 F.Supp. at 1327. Although appellants concede the government's prerogative to respond to attacks on the credibility of its witnesses, Brief for J. Pungitore at 9, they maintain that the rebuttal argument went beyond the permissible boundaries of "fair reply" and that the prosecutor engaged in impermissible vouching for the credibility of its witnesses based on evidence outside the record. Thus, they argue, under *United States v. DiLoreto*, 888 F.2d 996 (3d Cir.1989), decided after the district court

released its opinion, the remarks gave rise to *per se* reversible error.

In *DiLoreto*, various defense counsel argued in closing that key government witnesses were not credible because they were testifying pursuant to favorable plea agreements. 888 F.2d at 998. In response to these contentions, the prosecutor in his rebuttal summation attempted to rehabilitate the witnesses by stating in reference to the plea agreements, "If they lie, the bargain is off. That's it, no bargain. *We don't take liars. We don't put liars on the stand. We don't do that." Id.* at 999. The defendants promptly moved for a mistrial which was denied by the district court. *Id.* at 998.

This court interpreted the prosecutor's comments as an assertion "that the government as a matter of policy in the prosecution of its cases, does not use liars as witnesses." *Id.* at 999. As there was no evidence in the record to support the existence of any such policy, the court concluded that the government had improperly vouched for the credibility of its witnesses based on evidence outside the record. The court held that in such circumstances, improper prosecutorial comments give rise to *per se* reversible error. *Id.* at 999.

In certain respects, this case is factually distinguishable from *DiLoreto*, since here, not all of the prosecutorial comments bearing on credibility were lacking in evidentiary support. For example, we do not consider the following statement of the prosecutor to be "extra-record" vouching within *DiLoreto:* "the only way [DelGiorno and Caramandi] got their stories together is if law enforcement told them each what to say[,] and there is nothing to indicate that that happened, and it didn't happen." In contrast to *DiLoreto*, this statement does not suggest that the prosecutor had access to undisclosed facts which would support a favorable credibility determination with respect to government witnesses. Rather, the prosecutor merely asked the jury to consider that there were only two logical explanations for consistencies between DelGiorno's and Caramandi's testimony: either law enforcement officials

had fabricated their responses or the witnesses were telling the truth. Given that numerous law enforcement officials vehemently denied Thomas DelGiorno Jr.'s account of the debriefing process, we cannot fairly say that the prosecutor reached beyond the record in arguing that the scenario urged by defense counsel in their closing arguments "didn't happen." Instead, faced with contradictory testimony regarding the preparation of its witnesses, the prosecutor urged the jury to accept the testimony most favorable to the government. This, in itself, was proper argument.[57]

However, we do agree with appellants that in other portions of the rebuttal summation, the prosecutor attempted to bolster the credibility of testifying law enforcement personnel and the prosecutorial team by invoking facts which had no foundation in the record. In particular, we observe that there was no evidence backing the prosecutor's comments that the U.S. Attorneys and law enforcement officers could not have behaved as unscrupulously as defense counsel alleged they did without violating their oaths of office and jeopardizing their careers. Even setting aside *DiLoreto*'s strong condemnation of extrarecord vouching, we would disapprove of these portions of the prosecutorial argument, as it is inappropriate for a prosecutor to invoke his or her oath of office as a means of defending the credibility of government witnesses. *United States v. Torres*, 809 F.2d 429, 445, 446 (7th Cir. 1987) (Flaum, J., concurring) (prosecutor's claim that his oath of office prevented him from offering perjured testimony "placed him in the inappropriate role of a witness");

*United States v. Saenz*, 747 F.2d 930, 942 (5th Cir.1984), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985) (prosecutor's insinuation that he only prosecuted the guilty was improper, albeit fair reply to defense attacks on the prosecutor's integrity in maintaining prosecution). *See also United States v. Oxman*, 740 F.2d 1298, 1303 (3d Cir.1984), *vacated and remanded on other grounds sub. nom. United States v. Pflaumer*, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985) (disapproving of a prosecutor's suggestion that he might be "personally disadvantaged" if it were determined that a government witness had disregarded the truthful testimony proviso of his plea agreement). While it is unprofessional for any attorney to use his oath of office as a means of enhancing a witness's credibility, it is especially unbefitting for a prosecutor to do so because, as recognized in *United States v. Young*, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government rather than its own view of the evidence." 470 U.S. 1, 18–19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). *See also Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) (a prosecutor "may strike hard blows but he is not at liberty to strike foul ones.").

If, as appellants allege, *DiLoreto* controls, then we would have to reverse their convictions without examining whether the prosecutor's comments caused them any unfair prejudice. However, despite the factual similarities noted above, we do not view *DiLoreto* as controlling because in this case, unlike in *DiLoreto*, we may re-

---

**57.** Likewise, we find nothing improper in the prosecutor's comment that the testifying FBI agents and state troopers were brought into the case because they were not criminals. Viewed in context, the comment only points to the absence of any compelling evidence that the officers had engaged in misconduct, presumably to highlight the fact that not all of the government's witnesses were as culpable as DelGiorno and Caramandi. Our precedents do not constrain a prosecutor from pointing to an *absence* of evidence which might reflect negatively on his witnesses, so long as he does not suggest the existence of undisclosed facts which would support a favorable credibility determination.

*United States v. Beaty*, 722 F.2d 1090, 1097 (3d Cir.1983) (suggesting that the primary danger of "extra-record" vouching is that the jury will infer that the prosecutor has "special knowledge of the truth").

We note in passing that appellants make much of the fact that the government failed to introduce character evidence supporting the reference to the officers as "good" men. We do not think that this isolated reference to the witnesses' good moral character was prejudicial, especially given that the thrust of the comment was that the officers were called so that the jury "could judge their credibility from the witness stand." Tr. 11/16/88 at 175–76.

view only for plain error, as appellants failed to preserve their objections to the prosecutor's rebuttal summation.[58] To apply the *per se* rule established in *DiLoreto* in the absence of a contemporaneous objection would be completely inconsistent with *Young*, wherein the Supreme Court opined that a court may never apply a *per se* reversal rule to a trial defect subject to a plain error standard of review. 470 U.S. at 16 n. 14, 105 S.Ct. at 1047 n. 14 ("A *per se* approach to plain error review is flawed").

Thus, we may reverse only if we find an error in the prosecutor's comments so serious as to "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." In this regard, we are mindful of the Supreme Court's admonishment that

> a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial.

*Young*, 470 U.S. at 11, 105 S.Ct. at 1044. Thus, our objective is not to penalize the prosecutor for an inopportune remark, but to ensure that the appellants received a fair trial.

Reviewing the record as a whole, we conclude that a reversal is not warranted because the prosecutor's invocation of the oaths of office taken by the government officials involved in this case fell squarely within the invited response doctrine. *United States v. Robinson*, 485 U.S. 25, 33 & n. 5, 108 S.Ct. 864, 869 & n. 5, 99 L.Ed.2d 23 (1988); *Darden v. Wainwright*, 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *Young*, 470 U.S. at 12–13, 105 S.Ct. at 1045; *Lawn v. United States*, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958); *United States v. DiPasquale*, 740 F.2d 1282, 1296 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985). The doctrine teaches that where a prosecutorial argument has been made in reasonable response to improper attacks by defense counsel, the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial. *Young*, 470 U.S. at 12–13, 105 S.Ct. at 1045. We have interpreted the doctrine to mean that a prosecutor may neutralize improper defense arguments but may not rely on them as a "springboard" for the launching of affirmative attacks upon the defendants. *DiPasquale*, 740 F.2d at 1296 (explaining *United States v.*

---

**58.** We acknowledge that Joseph Pungitore's attorney, during the course of a sidebar conference held to discuss the merits of an entirely different objection to the rebuttal summation, objected to the prosecutor's defense of his own integrity during the summation:

> MR. LACHEEN: Judge, I'd like to put an objection on the record again. This is the third time now that the prosecutors have vouched for their own integrity in front of this jury by making the statement that for us, what we have said as defense attorneys to be true, they would have had to have violated their oaths of office. It's entirely improper. It's incorrect. It's wrong.
> MR. GORDON: We were attacked. It's the first time—

Tr. 11/16/88 at 283.
The prosecutor was interrupted by the judge, who questioned the attorneys about certain scheduling matters.

We could excuse counsel's apparent decision to wait for a suitable break in the argument to raise the objection, as we recognize that "interruptions of arguments ... are matters to be approached cautiously." *United States v.*

*Young*, 470 U.S. at 13, 105 S.Ct. at 1045. However, given that the objection, made a substantial period of time after the comments challenged on appeal, failed to identify them or specify the form of relief requested from the district court, we do not believe that the issue has been adequately preserved for our review.

At oral argument before us, defense counsel insisted that the district court understood the objection to be a motion for a mistrial, which was denied at the conclusion of the rebuttal argument. The only support we have found for this contention is the following "ruling" by the district court: "You had a prior motion, I think, I don't know if I ruled on it, but I'll deny it if I didn't deny it already." Tr. 11/16/88 at 307. We would not be justified in speculating that this vaguely worded ruling, which appears 24 pages of transcript after Mr. LaCheen's objection, was a denial of a motion for a mistrial. It is a simple matter for defense counsel expressly to request a mistrial, thus leaving no doubt as to the gravity and type of harm he believes his client has suffered. If defense counsel does so, we trust that the trial court's response will be prompt and unambiguous.

*Somers,* 496 F.2d 723 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974)). In other words, the doctrine's reach is limited to defensive, as opposed to offensive, conduct of the prosecutor.[59]

■ We acknowledge that in this case, Thomas DelGiorno Jr.'s testimony provided some evidentiary support for the appellants' challenges to the government's integrity in maintaining this prosecution. However, in analogizing the prosecution to historical persecutions, such as union busting in the 1930's, the internment of the Japanese during World War II, the blacklisting of communists, the harassment of political protestors, and the Spanish Inquisition, the appellants themselves exceeded the boundaries of proper advocacy.[60]

Furthermore, even if such comments could be excused as rhetorical flourishes, they, along with other assertions made by the appellants, amounted to a personal attack on virtually every government official involved in this case, including members of the prosecutorial team. The rebuttal summation did no more than refute what was an obvious inference from the appellants' closing arguments, namely that the prosecutors and law enforcement officers had engaged in fabrications and misconduct so extreme as to place their careers in jeopardy. In these circumstances, the prosecutor's invocation of the oaths of office cannot be considered anything other than a defensive response to the extremely serious allegations of misconduct made by the appellants.

■ We do not mean to suggest that defendants may not attempt to impugn a witness's credibility through evidence that his testimony was fabricated by unscrupulous government officials. However, when defendants choose to do so, they must confine their arguments to the scope of the evidence they have presented. Thomas DelGiorno Jr.'s testimony in no way justified the vicious assault on the government's integrity made in this case. Of course, closer supervision by the district court or a timely objection by the government might have eliminated the need for the prosecutorial response. *Young,* 470 U.S. at 13–14, 105 S.Ct. at 1045. However, given that the appellants themselves invited the comments challenged on appeal, we find no plain error requiring reversal of their convictions.

### 2. *Other Prosecutorial Misconduct*

■ Appellants' remaining allegations of prosecutorial misconduct require less discussion. In closing argument, the prosecutor referred to appellant Iannarella as a "cold-blooded murderer," tr. 11/11/88 at 115, and to various other appellants as "mob killers." Tr. 11/16/88 at 272. He also stated that appellants Joseph and Anthony Pungitore, Salvatore and Joseph Grande, and Phillip and Frank Narducci had "followed in their fathers' footsteps" in joining "the mob." Tr. 11/11/88 at 79. We find no prosecutorial misconduct in these comments, as we agree with the district court that they were fair comment on the evidence adduced at trial. 711 F.Supp. at 1327–28.[61]

---

**59.** It might be argued that the invited response doctrine implicitly was rejected by this court in *DiLoreto.* We decline to read *DiLoreto* in this manner. Our opinion never mentioned the invited response doctrine and it is inconceivable to us that *DiLoreto* was intended to foreclose invocation of the doctrine, as it is so firmly entrenched in Supreme Court precedent. *United States v. Robinson,* 485 U.S. at 33 & n. 5, 108 S.Ct. at 869 & n. 5; *Darden v. Wainwright,* 477 U.S. at 182, 106 S.Ct. at 2472; *Young,* 470 U.S. at 12–13, 105 S.Ct. at 1045; *Lawn v. United States,* 355 U.S. at 359 n. 15, 78 S.Ct. at 323 n. 15.

**60.** ABA Standard for Criminal Justice 4–7.8, provides in part that:

> (c) A lawyer should not make arguments calculated to inflame the passions or prejudices of the jury.
> (d) A lawyer should refrain from argument which would divert the jury from its duty to decide the case on the evidence *by injecting issues broader than the guilt or innocence of the accused under the controlling law* or by making predictions of the consequences of the jury's verdict.

Section 4–7.8 (emphasis supplied).

**61.** The prosecutor appears to have been justified in singling out Iannarella, as the evidence showed that Iannarella fatally shot Robert Riccobene in the presence of Riccobene's mother

Likewise, we find no substance to Scafidi's complaint that the prosecutor improperly commented upon witnesses' fears of retaliation from the appellants. The first such comment was made in response to certain remarks made by Virgilio's attorney concerning Kathleen Residence, Virgilio's former girlfriend, whose testimony implicated Virgilio in Judge Helfant's murder. The attorney argued, in part, that Residence was not a credible witness because she had testified in disguise. Tr. 11/16/88 at 75. In his rebuttal summation, the prosecutor asked the jury to consider that Residence had appeared in disguise because she "was scared to death." *Id.* at 182. The second was made in response to Scarfo's attorney's assertion that there were no eyewitnesses to any of the murders except for Joseph Salerno, Jr. *Id.* at 126. The prosecutor countered that several eyewitnesses testified but that, in some cases, they did not positively identify the perpetrators because they were "too scared." *Id.* at 274–75.

Inasmuch as no objection was made to the above comments, they are reviewable only for plain error. We find no error with respect to the comments concerning Residence's disguise, as her fear of the appellants could be readily inferred from her attire at trial. The prosecutor may have said more than was necessary to answer defense counsel's claim that there were no eyewitnesses to the murders. However, in view of evidence that appellants attempted to murder Joseph Salerno, Sr. because his son had testified against Scarfo in a previous proceeding, it cannot be said that the prosecutor introduced the idea to the jury that some witnesses might fear retaliation from the defendants. Thus, the comment, if error, was harmless.

Finally, several appellants claim reversible error stemming from the prosecutor's alleged attempt to quantify reasonable doubt. During his opening

statement, the prosecutor analogized the unfolding of the evidence to a jigsaw puzzle. Tr. 9/28/88 at 46–48. In closing summation, Salvatore Merlino's attorney adopted the prosecutor's jigsaw puzzle analogy, arguing that many of the pieces were missing and that other pieces were not genuine. Tr. 11/14/88 at 10. In rebuttal, the prosecutor conceded that some "pieces" were missing but argued that the "puzzle" as a whole was sufficiently completed to preclude any reasonable doubt as to the subject matter of the picture. Tr. 11/16/88 at 305–06. The prosecutor added that the government's case was analogous to a 500 piece jigsaw puzzle with 8 pieces missing. *Id.*

Although we agree that the prosecutor's argument improperly suggested a quantitative measure of reasonable doubt, we do not find that the appellants were thereby prejudiced, as the argument was fair reply to defense counsel's own revival of the jigsaw puzzle analogy. Moreover, the district court promptly gave a curative instruction as requested by defense counsel. *Id.* at 308–09. Inasmuch as appellants did not object to the curative instruction or request additional instructions, they apparently were satisfied with the district court's response and cannot now complain that comments gave rise to reversible error.

In sum, appellants have pointed to no instances of prosecutorial misconduct which would justify our granting them a new trial.

### E. SUFFICIENCY OF THE EVIDENCE

Appellants Nicholas Virgilio and Joseph Ciancaglini maintain that there was insufficient evidence to support their convictions under various counts.[62] We find that there was substantial evidence with respect to each charge challenged by appellants and will affirm.

The standard governing our review of these claims is firmly established. Our

and then hit her with a shotgun because she started screaming. Tr. 10/27/88 at 66–67.

**62.** We need not address Salvatore Grande's contention that there was insufficient evidence to prove his guilt of racketeering act 11, which

charged a conspiracy to murder Robert Riccobene, because Grande was not charged with that predicate offense. *See* Brief for S. Grande at 14; Jt.App. at 142–43 (Indictment).

inquiry is whether, viewing the evidence in a light most favorable to the government, there was substantial evidence upon which a reasonable jury could have based its verdict. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Leon,* 739 F.2d 885, 890 (3d Cir.1984). The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt. *United States v. Sandini,* 888 F.2d 300, 311 (3d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990). We will consider the appellants' contentions in turn.

### 1. *Virgilio*

 The indictment charged Nicholas Virgilio, a/k/a/ "Nick the Blade," in both RICO counts, the substantive RICO offense under 18 U.S.C. § 1962(c), Count 2, and the RICO conspiracy under 18 U.S.C. § 1962(d), Count 1. The jury's answers to special interrogatories indicated that it had based its verdict of guilt as to both RICO counts on Virgilio's participation in the murder of Judge Helfant, racketeering act 1, and on the extortions of John Hartung, racketeering act 24, and Jerome Slobotkin, racketeering act 25. Virgilio does not deny that there was sufficient evidence to prove his involvement in Helfant's murder.[63] Brief for Virgilio at 7. Nor does he contest that the two extortions were committed by members of the enterprise. However, he asserts that there was no evidence linking him to the extortions and, as a RICO pattern of racketeering must consist of at least two related predicates, he urges us to reverse his RICO convictions under both counts.[64]

Virgilio's defense is not one calculated to elicit much sympathy, as it amounts to an assertion that he may be a murderer but is not an extortionist. But the real infirmity of his argument is that it relies exclusively on the absence of direct evidence linking him to the particular shakedowns of Hartung and Slobotkin and completely discounts the significance of circumstantial evidence which would support a reasonable inference of guilt. The testimony of several witnesses unequivocally demonstrated that the extortions of John Hartung and Jerome Slobotkin occurred over prolonged periods of time as part of the LCN's massive shakedown operation of minor criminals unconnected to the enterprise. Tr. 10/28/89 at 26, 45–46; 11/4/88 at 161–64, 207–10.

 The primary evidence connecting Virgilio to the shakedowns was DelGiorno's testimony that Virgilio received a share of the shakedown proceeds:

Q: After Salvatore Merlino and Larry Merlino were taken down in early 1986, did the division of the shake or elbow change?

A: Yes

Q: How did it change?

---

63. In the event that we reject Virgilio's claim of insufficient evidence as to only one of the predicate extortions, Virgilio asserts that reversal is nonetheless mandated because the Helfant murder could not be charged as a predicate offense in view of the ten year limitation set forth in 18 U.S.C. § 1961(5). Brief for Virgilio at 7 n. 1. However, section 1961(5) is inapposite here. The section provides that

[A] 'pattern of racketeering' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity.

18 U.S.C. § 1961(5).

The plain language of this provision does not establish a statute of limitations time barring certain predicates. Rather, it signifies that the pattern of racketeering activity is not estab-

lished if the predicate acts occurred more than ten years apart. In this case, the ten year rule does not help Virgilio, as Judge Helfant's murder occurred on February 15, 1978, and both predicate extortions were continuing offenses committed as part of LCN's shakedown operation, which began in late 1981 and in the spring of 1982. Jt.App. at 160–61 (Indictment).

64. Scarfo, Iannece, Staino, and Salvatore Grande have adopted Virgilio's argument pursuant to Fed.R.App.P. 28(i). We have not extensively reviewed the sufficiency of the evidence linking these appellants to the shakedown operation, as their RICO convictions would stand on the basis of other predicate acts identified in the jury's special interrogatories, regardless of their guilt as to the shakedowns. *See* Jt.App. at 170–76. *See United States v. Riccobene,* 709 F.2d at 228.

A: It was split between Scarfo, Leonetti, Faffy, me, Ciancaglini still got his end. He gave Joe Grande 400 a month. *He gave the blade [Virgilio] 200 a month,* gave Nicky Whip 200 a month, and he gave Salvatore Scafidi 200 a month.

Q: When you say "He," who are you talking about giving those people that money per month?

A: Scarfo.

Q: What part of the shake money did that division that you just talked about come out of?

A: That came out of the stuff that they got every week.

Q: And what about the people who were still doing the shakedowns, what percentage of the money did they get?

A: Half.

Q: Do you know the what was the reason that the people who you mentioned, Nicholas Virgilio, Salvatore Scafidi, Joe Grande, got the money from the shakes per month?

A: *Well, they were in Philip's regime and they did things for Scarfo, errands, I guess, or jobs, whatever you want to call them.*

Tr. 10/12/88 at 67–68 (emphasis supplied). From this, the jury reasonably could infer that Virgilio regularly accepted a portion of the shakedown money, including that extorted from Hartung and Slobotkin, in return for various services rendered for Scarfo. Virgilio argues, however, that it would be speculative to infer that he had knowledge of the source of his income or that the "jobs" or "errands" mentioned by DelGiorno related to the shakedowns. We disagree.

■ Under these circumstances, Virgilio's receipt of the shakedown proceeds was sufficient to establish his agreement to the shakedown operation, and we will affirm his RICO conspiracy conviction on that basis. This court repeatedly has held that 18 U.S.C. § 1962(d) does not require the defendant's agreement to commit personally two

acts of racketeering. *United States v. Traitz,* 871 F.2d 368, 395–96 (3d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989); *United States v. Adams,* 759 F.2d 1099, 1116 (3d Cir.), *cert. denied,* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985). The government need only prove that the defendant agreed to conduct the affairs of the enterprise through a pattern of racketeering activity to be accomplished through the acts of co-conspirators. *Adams,* 759 F.2d at 1116.

As the district court observed, in view of the immense scale of the shakedown operation, the scheme could not have escaped Virgilio's notice. 711 F.Supp. at 1337. Virgilio protests that there was no direct evidence that he knew of the shakedowns, much less the particular shakedowns of John Hartung and Jerome Slobotkin.[65] He urges us to analogize this case to *United States v. Kragness,* 830 F.2d 842, 860 (8th Cir.1987), where the Court of Appeals for the Eighth Circuit, which follows the *Adams* rule, reversed a RICO conspiracy conviction because the defendant, although guilty of one predicate offense, had no knowledge of the other two offenses with which he was charged. However, the circumstances of *Kragness* were quite different than those here. The *Kragness* defendant was the Houston distributor of cocaine and quaaludes imported by a widescale drug enterprise with operations spanning several states. *Id.* at 851. Given the nature of the enterprise, the defendant's claim that he had no knowledge of two marijuana import schemes was credible.

In this case, the shakedowns were committed in the Philadelphia area by co-conspirators with whom Virgilio was closely associated and Virgilio directly profited from them. These facts provide strong circumstantial evidence that Virgilio agreed to the shakedown operation. The possibility that Virgilio may not have known of the particular extortions of Hartung and Slobotkin does not require a reversal of his

**65.** While both Hartung and Slobotkin testified, neither identified Virgilio as one of the individuals who collected the street tax from them. Hartung testified that an individual named Lou and later, Eddie Calabrese, normally collected the money. Tr. 11/4/88 at 163. Slobotkin said only that "[s]omeone came by every week and picked up the money." *Id.* at 209.

conviction, as that could easily be attributed to the fact that hundreds of individuals paid street taxes to the enterprise over a period of years. 711 F.Supp. at 1337. It would be curious indeed if Virgilio's apparent indifference as to the identities of the enterprise's extortion victims required a reversal of his RICO conspiracy conviction.

The validity of Virgilio's substantive RICO conviction requires more discussion. The district court acknowledged that DelGiorno's testimony may not have been sufficient to prove Virgilio's personal participation in the shakedowns, but considered that under a Pennsylvania statute consolidating theft offenses, 18 Pa.Cons.Stat. Ann. § 3902 (Purdon 1983), Virgilio was guilty of receipt of stolen property even if the evidence did not establish extortion. 711 F.Supp. at 1337–38. Accordingly, the court concluded that, under Pennsylvania law, "Virgilio [was] as guilty of an act involving extortion in receipt of the extorted monies as the individuals who personally committed the extortionate acts." *Id.* at 1338.

▮▮▮▮ Although we do not accept the district court's reasoning, we reach the same result. We depart from the district court insofar as it held that proof of Virgilio's knowing receipt of the extorted monies was sufficient to establish his personal commission of an act "involving extortion" for purposes of the RICO statute.[66] Section 1961(1) includes within the definition of "racketeering activity" "any act or threat involving ... extortion ... which is charge-

able under State law and punishable by imprisonment for more than one year." The government correctly points out that its proof of extortion need not satisfy all of the peculiarities of the state law, as the state offenses enumerated in section 1961(1) are merely definitional. *Rose v. Bartle,* 871 F.2d at 361–62; *United States v. Forsythe,* 560 F.2d 1127, 1134–35 (3d Cir.1977). But it still must establish extortion, generically defined.

The gravamen of an extortion offense under the Pennsylvania statute cited in the indictment is an express or implied threat that some harm will befall the victim should he fail to comply with the extortionist's demands.[67] *Commonwealth v. Wojdak,* 502 Pa. 359, 370–71, 466 A.2d 991, 997 (1983). Those elements are lacking in a theft through receipt of stolen property which, under Pennsylvania law, is established through proof that the defendant "intentionally receiv[ed], retain[ed], or dispos[ed] of movable property of another knowing that it has been stolen, or believing that it has probably been stolen...." 18 Pa.Cons.Stat.Ann. § 3925. In view of the different natures of the two offenses, we conclude that the RICO statute does not authorize the substitution of theft through receipt of stolen property for an act "involving extortion."

▮▮▮▮ Nevertheless, we find adequate support for the government's theory that Virgilio aided and abetted the shakedown operation and will sustain his conviction

---

**66.** The district court's conclusion depended to a large extent upon what we think was an erroneous construction of Pennsylvania's consolidation of thefts statute. We believe that the court was wrong in concluding that the statute authorized it to treat Virgilio's receipt of stolen property as the functional equivalent of an "act involving extortion" within 18 U.S.C. § 1961(1). The statute does not permit a trial judge to convert a conviction for extortion into one for receipt of stolen property where the defendant was tried solely for extortion. *Commonwealth v. Peduzzi,* 338 Pa.Super. 551, 553–54, 488 A.2d 29, 31 (1985) (consolidation of theft statute, 18 Pa.Cons.Stat.Ann. § 3902, did not authorize a post-verdict amendment of the indictment). *Commonwealth v. Lewis,* 299 Pa.Super. 367,

371, 445 A.2d 798, 800 (1982), cited by the district court, is not to the contrary, as that case held only that, under section 3902, a criminal complaint need not be dismissed for fatal variance between the theft charged and theft proven, as long as the defendant is "given adequate opportunity to respond so that he or she will not be prejudiced or surprised."

**67.** The indictment charged extortion under 18 Pa.Cons.Stat.Ann. § 3923, which provides that "[a] person is guilty of theft [by extortion] if he intentionally obtains ... property of another by threatening to (1) commit another criminal offense; (2) accuse anyone of a criminal offense; [or] ... (7) inflict any harm which would not benefit the actor."

under 18 U.S.C. § 1962(c) on that basis.[68] Brief for the United States at 92. Virgilio argues that his conviction may not be sustained under an aiding and abetting theory because the indictment did not mention that offense. We disagree. Federal courts have long recognized that a defendant indicted as a principal may be convicted upon proof that he aided and abetted the charged offense. *Nye & Nissen v. United States*, 336 U.S. 613, 618–20, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949); *United States v. Bryan*, 483 F.2d 88, 94–97 (3d Cir.1973) (en banc). Moreover, the district court expressly instructed the jury as to the elements of an aiding and abetting offense. Tr. 11/17/88 at 34–36, 62, 91–92. There is no question that the jury was entitled to consider aiding and abetting as a possible basis of guilt.

To prove aiding and abetting, the evidence must show that the defendant "in some way associated himself with the criminal venture as something he wished to bring about and that he sought by his actions to make it succeed." *United States v. American Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1103 (3d Cir.), cert. denied, —— U.S. ——, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989). As discussed above, Virgilio directly profited from the shakedown operation with full knowledge of how his income was generated. In the circumstances of this case Virgilio's knowing receipt of the extorted monies is sufficient to show that he "associated himself with the criminal venture as something he wished to bring about."

The requisite conduct element is supplied by DelGiorno's testimony that Virgilio was paid for his performance of "errands" for Scarfo as part of Philip Leonetti's crew and by evidence that on September 12, 1985, he attended a meeting with Leonetti, Scarfo, and DelGiorno at which they discussed the implications of the FBI's recent confiscation of shakedown proceeds from Salvatore Scafidi's house. Tr. 10/11/88 at 107, 123. Even if it would be speculative to infer that Virgilio's "errands" for Scarfo required his personal participation in the acts of extortion performed by the shakedown crews,[69] the jury was entitled to infer that the errands related in some fashion to the shakedowns, especially considering his close association with Leonetti, who supervised a shakedown crew. This evidence, considered in tandem with his attendance of a meeting convened to address the threat to the shakedowns posed by the FBI, supplies substantial support for an inference that Virgilio acted in furtherance of the shakedown operation. *Cf. United States v. Rastelli*, 870 F.2d at 838 (evidence that defendant knowingly received extortion proceeds, coupled with his admission "that if he ever did 'a favor for [the crime family in control of the extortion] [he] would get something'" was sufficient to prove his guilt of an extortion conspiracy).

Reading the evidence in a light most favorable to the government, we will sustain Virgilio's convictions under both RICO counts. With respect to the substantive RICO count, we emphasize that our decision does not rest solely upon Virgilio's knowing receipt of the extortion proceeds or upon his close association with the principals in the shakedown extortions. The evidence supports a reasonable inference that Virgilio personally furthered the shakedown operation by performing acts

---

68. It is beyond dispute that a RICO conviction may rest upon the defendant's aiding and abetting of charged predicate offenses. *See United States v. Rastelli*, 870 F.2d 822, 832 (2d Cir.), cert. denied, —— U.S. ——, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989); *United States v. Qaoud*, 777 F.2d 1105, 1117–18 (6th Cir.1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986); *United States v. Cauble*, 706 F.2d 1322, 1339–41 (5th Cir.1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984).

69. The government suggests that we infer from DelGiorno's reference to "jobs" or "errands" that Virgilio directly participated in the shakedowns. To support this inference, the government cites *United States v. Martorano*, 557 F.2d 1, 8 (1st Cir.1977), cert. denied, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978), wherein the court concluded that an individual who collected weekly interest payments from an extortion victim was more than a mere "errand boy" but was the defendant's co-conspirator. However, we would not be justified in placing undue reliance on *Martorano* because there, the evidence established the nature of the "errands."

entitling him to remuneration from the shakedown proceeds and by discussing with his co-conspirators the FBI's intrusion into the operation. Accordingly, the jury reasonably found that Virgilio committed the requisite extortionate predicates by aiding and abetting the acts of his co-conspirators.

### 2. *Ciancaglini*

 Joseph Ciancaglini was convicted under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 of distributing or aiding and abetting the distribution of methamphetamine, a controlled substance.[70] He argues that the evidence was insufficient to prove a completed delivery of methamphetamine or that he aided any such distribution. He also asserts that in reviewing the sufficiency of the evidence, we should not consider DelGiorno's testimony concerning the nature of the substance because it consisted entirely of inadmissible hearsay. Brief for Ciancaglini at 36. Based on our review of the record, we find no substance to these contentions.

Ciancaglini's guilt as to the distribution offense was established through the testimony of Thomas DelGiorno. Tr. 10/12/88 at 29–32. DelGiorno stated that in May of 1983, Ciancaglini, then a captain in the enterprise, authorized him to arrange a methamphetamine deal between two drug dealers, John Santilli and Vinnie Perry. Ciancaglini and DelGiorno, with underboss Salvatore Merlino's approval, agreed that certain members of the enterprise would receive $3000 for every pound of methamphetamine Santilli sold to Perry. Although DelGiorno never actually saw the drugs,[71] he stated that he received $150,000 from a series of transactions involving fifty pounds of methamphetamine. Pursuant to the co-conspirators' agreement, DelGiorno turned half of the profits over to Ciancaglini, who provided Scarfo and Merlino with their shares:

> Q: What did you actually do with the $150,000?
> A: I gave him $75,000.
> Q: Who did you give the $75,000 to?
> A: Ciancaglini.
> Q: And what was your understanding of what he was supposed to do with the $75?
> A: Half of it he had to give to Chuckie [Salvatore Merlino] and Scarfo.
> Q: Do you know if he did do that?
> A: Yes.
> Q: How do you know that?
> A: He told me and Chuckie told me he got the money.

Tr. 10/12/88 at 32–33.

Section 841(a)(1) makes it a crime knowingly or intentionally "to manufacture, distribute, or dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1).[72] Courts have broadly construed the term, "distribute," as encompassing any acts "perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price." *United States v. Brunty,* 701 F.2d 1375, 1381 (11th Cir.), *cert. denied,* 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983). *See also United States v. Baresh,* 790 F.2d 392, 399 (5th Cir.1986) (aiding and abetting charge under section 841 did not require proof that defendant had actual or constructive possession of marijuana or that he was physically present when the drugs were distributed); *United States v. Winston,* 687 F.2d 832, 834–35 (6th Cir.1982). Thus, assuming that Santilli and Perry engaged in a methamphetamine deal, DelGiorno's testimony that Ciancaglini authorized him to arrange the deal would be sufficient to prove that he

---

**70.** The jury's special interrogatory answer does not indicate whether the guilty verdict was based on Ciancaglini's aiding and abetting or his personal commission of the distribution offense. Jt.App. at 1232.

**71.** DelGiorno testified as follows:
> Q: Did the drugs actually pass through your hands or did they just go from one of these people to the other one?

> A: I just introduced them. I didn't touch the drugs. I didn't see the drugs.

Tr. 10/12/88 at 31.

**72.** The statute defines, "distribute," to mean "to deliver," 21 U.S.C. § 802(11), which, under section 802(8), refers to "the actual, constructive, or attempted transfer of a controlled substance."

participated in a distribution of that substance.

Although DelGiorno had no personal knowledge about what actually transpired between Santilli and Perry, a reasonable jury could infer from DelGiorno's receipt of the $150,000 that the methamphetamine deal was consummated. Furthermore, contrary to Ciancaglini's assertions, the government's proof that the substance sold was methamphetamine did not rest solely on the hearsay declarations of Santilli and Perry, as the manner in which the deal was arranged and the large sums of money involved provide strong circumstantial evidence that the transaction concerned an illicit substance. *United States v. Murray,* 753 F.2d 612, 615 (7th Cir.1985) ("A high price for the substance purchased and the covert nature of the transaction ... may provide support that the substance was a drug"); *United States v. Zielie,* 734 F.2d 1447, 1456 (11th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). As the parties contemplated a methamphetamine deal, the jury certainly was justified in concluding that the substance in fact was methamphetamine.

In short, we have no difficulty concluding that the evidence was sufficient to support Ciancaglini's conviction under section 841(a)(1).

## F. CHALLENGES TO THE INDICTMENT

1. *Alternative Theories on Murder Predicates and Inclusion of Conspiracies as Predicate Acts in RICO Conspiracy Charge*

▆▆▆▆ The Narduccis claim that the indictment was fatally defective because 18 U.S.C. § 1961(1)(A), which defines racketeering activity, does not specifically mention attempted murder and conspiracy to murder, both of which were charged as predicate acts in both RICO counts. In addition, they contend that Count 1, the RICO conspiracy charge, impermissibly charged conspiracies to commit murder in contravention to settled principles of criminal law barring prosecution for an attempt or a conspiracy to commit an inchoate crime. These contentions are meritless.

In *United States v. Echeverri,* 854 F.2d 638, 648–49 (3d Cir.1988), we decided that the language in 18 U.S.C. § 1961(1)(D), bringing within the definition of "racketeering activity" "any offense involving ... narcotic or other dangerous drugs" was broad enough to encompass a conspiracy to possess and distribute controlled substances, even though conspiracy is not expressly mentioned in the subsection. Section 1961(1)(A) contains similar "involving" language and so our holding in *Echeverri* applies with equal force here. *See also United States v. Manzella,* 782 F.2d 533 (5th Cir.), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986) (conspiracy to commit arson is within section 1961(1)(A)); *United States v. Ruggiero,* 726 F.2d 913, 918 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984) (conspiracy to commit murder). In view of the foregoing authority, it is beyond question that the indictment properly charged attempts and conspiracies to commit murders.[73]

The Narduccis' further contention that a conspiracy may not serve as a predicate for

---

**73.** The Narduccis' related contention, that attempts and conspiracies to commit murders are not offenses under Pennsylvania and New Jersey law, is not worthy of discussion. These certainly are chargeable offenses in both jurisdictions. *See Commonwealth v. Orlowski,* 332 Pa.Super. 600, 481 A.2d 952 (1984); *Commonwealth v. Todt,* 318 Pa.Super. 55, 464 A.2d 1226 (1983) and *State v. Madden,* 61 N.J. 377, 393, 294 A.2d 609 (1972); *State v. Fornino,* 223 N.J. Super. 531, 539 A.2d 301 (App.Div.1988).

Likewise, their complaint that the indictment did not charge overt acts in furtherance of the Pennsylvania murder, as required by Pennsylvania law, is incorrect. Brief for Narduccis at 16. The indictment did allege that the defendants committed overt acts. Jt.App. at 139, 140–41, 143. Moreover, the district court specifically instructed the jury that an overt act in furtherance of the murder conspiracies was required by Pennsylvania law. Tr. 11/17/88 at 69–70 ("[I]n some conspiracy statutes there's also requirement for the overt act, that we actually take a step so to speak, do an act in furtherance of the conspiracy. The Pennsylvania law of conspiracy requires that. It requires an overt act").

a RICO conspiracy is based on a misconception of the RICO conspiracy offense. First, as discussed above, section 1961(1)(A) clearly encompasses predicate conspiracies. Because the definition of racketeering activity in section 1961(1) applies equally to RICO offenses under sections 1962(c) and (d), the inclusion of predicate conspiracies in RICO conspiracy charges is statutorily authorized. *See Ruggiero,* 726 F.2d at 918. Second, the conceptual problems discussed by appellants in charging conspiracies to commit inchoate offenses do not arise in the RICO context.

It is important to bear in mind that the RICO conspiracy and the predicate conspiracy are distinct offenses with entirely different objectives. As stated in *United States v. Riccobene,* the objective of a RICO conspiracy is to " 'assist the enterprise's involvement in corrupt endeavors.' " 709 F.2d at 224 (citation omitted). In contrast, the objective of the predicate conspiracy is confined to the commission of a particular substantive offense, in this case, individual acts of murder. *Ruggiero,* 726 F.2d at 923 ("A RICO conspiracy under 1962(d) based on separate conspiracies as predicate offenses is not merely a 'conspiracy to conspire' as alleged by appellants, but is an overall conspiracy to violate a substantive provision of RICO."). As a RICO conspiracy and its underlying conspiracy offenses arise from different agreements, and section 1961(1)(A) authorizes the charging of predicate conspiracies, the inclusion in the indictment of predicate conspiracies to commit murders did not constitute error.

### 2. *Duplicitous Pleading*

 Finally, the Narduccis allege that the indictment was duplicitous because it charged attempted murder, conspiracy to murder, and murder as alternative theories within individual predicate acts. The court has defined duplicity as the "joining in a single count of two or more distinct and separate offenses." *United States v. Starks,* 515 F.2d 112, 116 (3d Cir.1975). In *Starks,* the defendants were charged in a single count with a conspiracy and an attempt to extort in violation of the Hobbs

Act, 18 U.S.C. § 1951. The court strongly voiced its disapproval of the duplicitous framing of the indictment:

> One vice of duplicity is that a general verdict for a defendant on [the duplicitous count] does not reveal whether the jury found him not guilty of one crime or not guilty of both. Conceivably this could prejudice the defendant in protecting himself against double jeopardy. Another vice of duplicity is that a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or of both. Conceivably, this could prejudice the defendant in sentencing and in obtaining appellate review.

515 F.2d at 116.

However, the court stopped short of holding that duplicity in the indictment necessarily requires a new trial because it found another error which clearly required reversal. *Id.* at 118.

The Narduccis rely on *Starks* in arguing that the indictment's inclusion of alternative theories regarding the predicate murders constituted duplicitous pleading which fatally flawed the indictment. In addition to the dangers of duplicity noted in *Starks,* the Narduccis suggest that the jury may not have been unanimous as to which theory of murder formed the basis for its finding of guilt as to individual predicate acts. Brief for Narduccis at 21.

The government, however, asserts that the indictment was not duplicitous. It points to several RICO cases in which the courts rejected similar claims of duplicity with respect to individual racketeering acts. *See United States v. Yarbrough,* 852 F.2d 1522, 1530 (9th Cir.1988), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988); *United States v. Castellano,* 610 F.Supp. 1359 (S.D.N.Y.1985). *See also United States v. Pepe,* 747 F.2d 632, 673 (11th Cir.1984) (finding no duplicity where substantive RICO offense was predicated upon pattern of racketeering activity and upon collection of unlawful debt). In *Yarbrough,* the court opined that duplicity occurs only where the indictment charges

more than one crime. *Id.* at 1530–31. As the *Yarbrough* defendant was charged only with RICO and not with the challenged predicate offenses, the court concluded that the assertion of alternative theories regarding the predicates did not render the RICO charges duplicitous.

While we do not necessarily agree with the reasoning in *Yarbrough,* we reach a similar result. Arguably, the indictment was duplicitous insofar as the predicate acts were concerned, as a conspiracy to murder is not the same offense as a consummated murder. The fact that the appellants were specifically charged with racketeering, rather than with offenses involving murder, does not mean that the dangers associated with duplicitous pleading were not present in this case. *See Starks,* 515 F.2d at 116. Had the jury returned only a general verdict as to the RICO predicates, we might have difficulty ascertaining the basis for the jury's findings as to individual predicates, and there might be a real question regarding the unanimity of the verdict.

 But these concerns are entirely hypothetical because the jury returned special interrogatories which indicated the theory of murder upon which the jury relied.[74] Jt.App. at 1230. For instance, the jury found that Salvatore Merlino had participated in a conspiracy to murder Joseph Salerno, Sr. but was not guilty of Salerno's attempted murder. *Id.* at 1247. Moreover, the district court, when explaining the special verdict forms, reminded the jury that its verdict had to be unanimous as to each predicate act. Tr. 11/17/88 at 133. Given that the forms specified the alternative theories, we are satisfied that the judge's in-

struction sufficiently informed the jury of its obligation to deliver a unanimous verdict as to a particular theory of murder. We will presume that the jury followed those instructions. *See Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985).

We also note that the indictment would be more troubling had the government framed it so as to charge the alternative theories as separate racketeering acts. As a general proposition, the government is not free to "fragment an act that plainly is unitary into multiple acts in order to invoke RICO." *United States v. Indelicato,* 865 F.2d at 1383.

In sum, we conclude that the duplicitous framing of charges concerning certain racketeering acts did not constitute reversible error because, in view of the detailed special interrogatories, it did not prejudice the appellants. We need not consider whether in other circumstances, duplicity in an indictment, without more, could give rise to reversible error.

### 3. *Claim of Fatal Variance*

John Leone testified that in late 1986, Scafidi and Joseph Grande ordered him to pay them $200 a week because he had insulted Scarfo by refusing to shake his hand at a wedding reception. Tr. 11/7/88 at 13–14. Leone paid the money for three or four weeks but discontinued the payments when "[e]verybody got locked up." *Id.* at 14. Based on Leone's testimony the jury found Scafidi and Grande guilty of racketeering act 40, which charged them with obtaining through extortion over $600 from an individual identified as "J.L.," in

---

**74.** The Narduccis also challenge the use of special interrogatories in this case. Specifically, they contend that the interrogatories encouraged the jury to deliver guilty verdicts on the RICO counts because the interrogatories, given to the jurors before they completed their deliberations, summarized and collated the numerous charges against each appellant, "thus leading ineluctably to a finding of guilty." Brief for Narduccis at 25. Accordingly, they believe that we should discount the significance of the special interrogatories when determining the basis of the jury's verdict.

This claim does not merit extensive discussion. It is necessary to make a timely objection to the use and wording of special interrogatories so that any defects in them may be cured by the trial court. *See United States v. Palmeri,* 630 F.2d 192, 202 & n. 8 (3d Cir.1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981). Because appellants failed to object, the issue is not properly before us. However, even if the issue were preserved for our review, we would hold that it was not error for the district court to submit the interrogatories to the jury during their deliberations, and that the wording of them was entirely proper.

violation of 18 Pa.Cons.Stat.Ann. § 3923. Jt.App. at 170.

Scafidi claims that the district court abused its discretion in denying his motion *in limine* to exclude Leone's testimony on the ground that the government's extortion theory varied fatally from the indictment. Tr. 11/7/88 at 7–8. In his motion, Scafidi's attorney argued that the extortion theories in the indictment were limited to the enterprise's collection of street taxes from persons involved in criminal activities, and to its extortions of legitimate businesses in need of resources controlled by the enterprise. *Id.* at 8. In his view, because the government alleged a different motive for the Leone extortion, Leone's testimony was inadmissible. *Id.* Scafidi renews this argument on appeal and raises the additional contention that the government unduly delayed in providing defense counsel with *Jencks* material regarding the extortion. Brief for Scafidi at 28.

■ These arguments are frivolous. We need not consider Scafidi's claim of fatal variance because we perceive no variance between the indictment and Leone's testimony. On its face, the indictment did not specify the motive for the Leone extortion. Whereas extortion offenses committed as part of the shakedown operation were grouped together in the indictment, Jt.App. at 157–67 (racketeering acts 23–38), the Leone extortion was separately charged as racketeering act 40. Accordingly, preliminary comments concerning the shakedown extortions did not apply to racketeering act 40, and the government's theory of prosecution as to that act was left undefined.[75]

Scafidi's suggestion that the government delayed in providing him with *Jencks* material strikes us as somewhat disingenuous, considering that his trial attorney appears to have been thoroughly familiar with Leone's expected testimony at the time he argued the motion *in limine*. Furthermore, no defense attorney raised this issue with the district court or claimed that Leone's testimony caused unfair surprise. Thus, we find Scafidi's argument unpersuasive in all respects.

## G. IMPLICATION OF SCARFO'S ATTORNEY IN ROUSE EXTORTION

Appellants pursued a unified defense strategy which focussed on attacking the credibility of two key government witnesses, Nicholas Caramandi and Thomas DelGiorno. Several appellants now assert that they were irreparably prejudiced in that defense by the prosecutors' alleged attempts to impugn the integrity of Scarfo's attorney, Robert F. Simone, Esq., and by evidence that Simone was an unindicted co-conspirator in the Rouse extortion, racketeering act 39.[76] In addition, Anthony Pungitore, Jr. maintains that his attorney, Joseph P. Capone, Esq., labored under a conflict of interest caused by a professional association with Simone, which precluded Capone from effectively representing him.

On September 8, 1988, the government advised the court that Capone had a close working relationship with Simone and that it might be prudent to establish on the record the precise nature of the relationship. Jt.App. at 777. In response to the district court's inquiries, Simone stated:

> Joseph Capone ... graduated Temple University and ... became associated with my office on a full-time basis in approximately January of this year. Mr. Capone has his own office in the same building, which I rent.... Mr. Capone has his own secretary who does quite a bit of legal work for me not as an em-

---

**75.** Nor was the government required to define the offense with greater specificity. *United States v. Cerone*, 830 F.2d 938, 951 (8th Cir. 1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1730, 100 L.Ed.2d 194 (1988) ("[T]he defendant is entitled to a short, concise statement of facts constituting the offense charged, but he is not entitled to know the evidentiary details with which the government intends to convict him."). If Scafi-

di felt that the indictment was too vague to permit him effectively to prepare a defense, his proper recourse would have been a request for a bill of particulars under Fed.R.Crim.P. 7(f).

**76.** Simone was not mentioned by name in racketeering act 39 but the list of unindicted co-conspirators in the charge was not all inclusive.

ployee but as an associate. I pay him for the work that he does. I do not deduct taxes. He pays his own taxes. *He has his own practice which I do not participate in....* [H]e's a member of the Philadelphia and the New Jersey Bar. *We are not partners. He's not my employee but we do work together on many cases.* Mr. Scarfo has been made aware of that from the beginning from the time Mr. Capone first came with me. Mr. Anthony Pungitore has been made aware of that from the time Mr. Capone first became associated with me. Mr. Capone had ordered, having nothing to do with this case, his own stationery. I'm not sure that he's ... gotten it yet, but I know *he has ... his own stationery and that's not for the purposes of this case, but for the purposes of his own practice.*[77]

Jt.App. at 774–75. (Emphasis supplied).

After advising the court that he had introduced Capone to Pungitore, Simone continued:

[Pungitore and Capone] spoke themselves and he-he retained Mr. Capone. I kept [Assistant U.S. Attorney] Pichini aware of this. I alerted to the potential conflict. I've alerted to Mr. Pungitore and Mr. Scarfo. *[T]here is no conflict for all intents and purposes.* Mr. Capone will be representing Mr. Pungitore. I will be representing Mr. Scarfo. It's that simple.

Jt.App. at 776. (Emphasis supplied).

In response to a question posed by the district court, Capone stated that he agreed with Simone's representation of their professional relationship. Furthermore both Anthony Pungitore, Jr. and Scarfo said

they agreed with it. No further inquiry was made.

The following day, the district court, again at the government's behest, held another sidebar conference to discuss other potential problems concerning Simone's representation of Scarfo. At the conference, the government informed the court that it expected to introduce evidence which would implicate Simone in the attempted extortion of Rouse Associates, an offense charged as racketeering act 39 in the RICO counts. The government also stated that it would seek the admission of photographs depicting Simone with several appellants and that DelGiorno would testify that Simone was present during a conversation with Scarfo regarding the murder of Judge Helfant. Jt.App. 914–17. The district court then explained to Scarfo the risks inherent in Simone's continued representation of him. Scarfo, however, insisted that he wanted Simone to represent him and the conference was concluded.[78]

As expected, the government introduced evidence tending to show a close association between Simone and various appellants, as well as evidence that Simone participated in planning the Rouse extortion scheme and was slated to receive a ten percent share of the extortion proceeds. Tr. 10/13/88 at 22. In addition, DelGiorno testified that Simone intimated that he wanted to have Councilman Beloff's aide, Robert Rego, killed because Rego "could really, really hurt" Simone. *Id.* at 34–36. The district court sustained Simone's objection to the above testimony and instructed the jury to disregard it. *Id.* In a similar

---

77. We recognize that Simone has stationery with Capone's name on it.

78. THE COURT: Mr. Scarfo one other thing and I'm not saying he's going to do this, but there's a natural tendency sometimes if someone is charged with a crime that he might try to save his own skin, so to speak, if you understand, he might not want things to come out concerning him to your detriment. You understand that?
SCARFO: Yes, sir.
THE COURT: Now, I'm not saying that's going to happen in this case but it's a normal

human tendency that some people have. Knowing that you still want Mr. Simone to be your lawyer?
SCARFO: I still want Mr. Simone-yes, sir. That's all right, Judge.
THE COURT: And that causes you no problem, you still want him as your lawyer?

. . . . .

SCARFO: Nope, I still want him as my lawyer.
THE COURT: Mr. Scarfo, thank you sir.
Jt.App. at 926–27A.

vein, Caramandi testified that he agreed to cooperate with the government because "Scarfo and Bobby Simone were going to kill [him]." Tr. 10/29/88 at 123. The following trial day, pursuant to an agreement between the prosecutors and defense counsel, the government revisited this issue and Caramandi recanted that portion of his testimony.[79] In his closing argument, Simone argued that he and Scarfo's co-defendants were accused of criminal conduct solely because they were friends with Scarfo: "I'm not ashamed to say that Mr. Scarfo's a personal friend of mine.... I'm ashamed to say that I've been accused of a lot of things in this case because I happen to be his lawyer. So if you get close to Mr. Scarfo, you have to watch out for these people." Tr. 11/16/88 at 117. Presumably in response to these comments, the prosecutor in his rebuttal argument held up a surveillance photograph showing Simone with Scarfo and stated, "Look like a lawyer representing his client or does it look like someone who might also be a friend." Tr. 11/16/88 at 264.

### 1. *Anthony Pungitore's Claim of Joint Representation*

Anthony Pungitore, Jr. contends that the Simone's comments at the September 8, 1988, conference demonstrated that Simone and Capone were "associated in the practice of law" within the meaning of Fed.R. Crim.P. 44(c) and that the district court erred in not personally advising him of his right to separate representation, as re-

quired by that rule. Because the district court never elicited his waiver of any potential conflicts of interests stemming from the 'joint representation,' Pungitore submits that any actual conflict of interest impairing his attorney's performance at trial would require a reversal of his conviction. He further alleges an actual conflict of interest predicated upon the fact that Capone "was in a position of subservience to" Simone, who in turn, "faced substantial conflicts of interest." Reply Brief for A. Pungitore at 16. In addition, he suggests that references to Simone's involvement in criminal activities had a more devastating impact on his defense than on that of other appellants because of the association between Simone and Capone.

Pungitore's primary contention, however, is that Capone's financial and professional dependence on Simone prevented him from exercising independent professional judgment regarding Pungitore's defense strategy. For instance, he asserts that while other appellants' attorneys may have made a tactical decision to participate in the unified defense strategy, Capone's adoption of that strategy "was itself suspect" because of the association. Brief for Pungitore at 34. Rather than pursuing a myriad of independent defense strategies,[80] Pungitore alleges that Capone passively acquiesced to Simone's tactical decision to develop a common defense so as not to jeopardize their professional relationship.

---

**79.** Q: Mr. Caramandi, is it a fact that Robert Simone was not one of the individuals that was going to kill you?
A: No, the order has to come from Scarfo.
Q: Simone was not one of the individuals that was going to kill you, is that correct?
A: No.
Q: Nor was he one of the individuals who was going to have you killed, is that correct?
A: No.
Tr. 10/31/88 at 9.
Joseph Pungitore points out that the literal meaning of the above passage was that Simone was going to kill Caramandi, as both the questions and answers were negatively framed. Brief for J. Pungitore at 31. Thus, he argues, Caramandi's purported recantation was not sufficient to reduce the prejudicial impact of his earlier testimony. *Id.* We disagree. The clear import of the above passage was that Simone

had not conspired with Scarfo to have Caramandi killed.

**80.** For example, Pungitore asserts that Capone might have moved for a severance, and thus avoided the prejudicial spillover of evidence concerning other appellants, in particular, his brother, Joseph. He alleges that he was severely prejudiced by DelGiorno's testimony that Scarfo coerced Joseph Pungitore into assisting in Salvatore Testa's murder by threatening to have Anthony and his father killed if Joseph did not comply with Scarfo's orders. Tr. 10/11/88 at 35. According to Anthony Pungitore, "such testimony, in conjunction with testimony that Pungitore Sr. was a 'made member' of LCN, ... gave rise to the inference ... that Anthony Jr. probably was, as he was alleged to be, a member of LCN." Brief for A. Pungitore at 35.

■ Pungitore's entire argument is predicated upon his assumption that the district court wrongly concluded that Simone and Capone were not associated practitioners. Our review of this question is limited. We see no reason not to accept the district court's implicit conclusions with respect to the character of Simone's and Capone's practices as they are fully supported in the record and the scope of its inquiry under Rule 44(c) is committed to its discretion, *see United States v. Bradshaw,* 719 F.2d 907, 914 (7th Cir.1983), although its ultimate legal conclusion that they were not "associates" is subject to plenary review. *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980) (the existence of multiple representation is a mixed question of fact and law).

In this case in view of the district court's treatment of the matter, it is apparent that it accepted Simone's characterization of his and Capone's practices. Its reliance on Simone's statements was entirely reasonable. *See Cuyler,* 446 U.S. at 347, 100 S.Ct. at 1717 ("trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel"); *United States v. Crespo de Llano,* 838 F.2d 1006, 1012 (9th Cir.1987); *United States v. Bradshaw,* 719 F.2d at 915 n. 3. Given that Simone and Capone had separate stationery available and had different clients, and that Capone paid his own taxes and had his own secretary, the court's legal conclusion that Simone and Capone had independent practices was justified, and to the extent our review is plenary we adopt it as our own, as the attorneys' sharing of office space and their participation in joint trials did not lead inexorably to the conclusion that they were associates. *Accord United States v. Varca,* 896 F.2d 900, 903 (5th Cir.1990)

("[P]ractitioners who share office space and occasionally consult with one another are not regarded as constituting a single firm for conflict purposes."). As Simone and Capone were not associates, Rule 44(c) did not apply and the district court had no obligation to advise either Scarfo or Pungitore of any conflicts of interest which potentially could arise from joint representation.[81]

Pungitore insists, however, that the district court abused its discretion in relying on Simone's assertions, in view of the government's intimation the following day that Simone may have participated in the same criminal activity charged against some of the appellants. But the district court was fully competent to assess Simone's credibility. Simone had no reason to misrepresent the nature of his practice to the district court and, in any event, Capone, who was not implicated in any criminal activity, fully concurred with Simone's statement. We will not second guess the district court's assessment of the attorneys' credibility, as it was completely reasonable on the record before it.

■ Moreover, even assuming that Simone and Capone were associates, the district court's failure to advise Pungitore personally about his right to separate trial counsel, as required by Rule 44(c), would not justify a reversal of his conviction. Numerous courts have held that Rule 44(c) is only a prophylactic measure designed to ensure that a defendant's Sixth Amendment right to effective assistance of counsel is not impaired by an actual conflict of interest. *Crespo,* 838 F.2d at 1013; *United States v. Mooney,* 769 F.2d 496, 499 (8th Cir.1985); *United States v. Burney,* 756 F.2d 787, 791 (10th Cir.1985); *Bradshaw,* 719 F.2d at 915 ("[a] complete failure to comply with Rule 44(c) does not mandate a

---

**81.** On its face, Rule 44(c) only applies if the court finds an association between the attorneys:

(c) Joint Representation. Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall

promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

reversal if the defendant is unable to demonstrate an actual conflict."). *See also* Fed.R.Crim.P. 44(c), Advisory Committee's Note to 1979 amendment ("The failure in a particular case to conduct a rule 44(c) inquiry would not, standing alone, necessitate the reversal of a conviction of a jointly represented defendant.").

■ To justify reversal, an appellant must point to an actual conflict of interest which adversely affected his attorney's performance. *Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987); *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718; *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989). An actual conflict of interest occurs if " 'the defendants' interests diverge with respect to a material factual or legal issue or to a course of action' " such that the attorney finds himself in the untenable position of serving two clients with incompatible needs. *Gambino*, 864 F.2d at 1070 (citation omitted). If the conflict results in a "lapse in representation," demonstrated either through affirmative steps taken contrary to the defendant's best interests or through attorney omissions, prejudice to the defendant is presumed. *Id.*

Pungitore has not demonstrated a Sixth Amendment violation predicated upon a conflict of interest. To make a colorable showing of a conflict, Pungitore had to show that he and Scarfo had divergent interests, not that Capone was beholden to Simone. He has not even attempted to do so. There is no reason to believe that the facts that Capone did not request a severance or stray from the common defense had anything to do with his alleged joint representation of Scarfo, as Scarfo's defense would not have been undermined by either action. Furthermore, there is no suggestion that Capone suppressed a defense available to Pungitore because it might have inculpated Scarfo.

In view of the foregoing, we reject Pungitore's claim of a conflict arising from joint representation. As we have accepted the district court's conclusion concerning the independence of Capone's and Simone's law practices, we add that Pungitore stood in the same position as other appellants with respect to the prejudice alleged to flow from Simone's implication in the Rouse extortion. Thus, we will consider Pungitore's arguments concerning that issue in conjunction with those of other appellants who have addressed it.

### 2. *Prejudicial Effect on Scarfo's Co-Defendants*

Ciancaglini, Staino, the Narduccis, and the Pungitores argue that the admission of evidence implicating Scarfo's attorney, Robert F. Simone, Esq., in the Rouse extortion so prejudiced Scarfo's co-defendants as to require reversal of their convictions. Although appellants differ in how they frame their arguments, they each allege that the government intentionally set out to inflame the jury by undermining Simone's integrity. They argue that because Simone functioned as lead defense attorney, this prosecutorial misconduct caused extreme prejudice to all of the appellants, as the jury inevitably would infer that the entire defense team had participated in the enterprise's criminal activities. In a similar vein, Ciancaglini and Joseph Pungitore maintain that Simone, in his capacity as lead defense counsel, labored under an actual conflict of interest which impeded his representation not only of Scarfo, but of Scarfo's co-defendants. In their view, the district court either should have elicited their waiver of the conflict or ordered the government to drop or modify the charges concerning the Rouse extortion. In addition, they believe that it was incumbent upon the district court to monitor more closely the testimony and the prosecutor's closing summation to ensure that prejudicial references to Simone were kept to a minimum.

■ We will review these contentions for plain error because appellants failed to raise them at trial.[82] We find no prosecuto-

---

82. The Narduccis assert that they never had an opportunity to make a timely objection because

they never were informed that the government's proof would implicate Simone in the Rouse

**1142**

rial misconduct or error on the part of the district court.

■ We do not take issue with appellants' basic premise that, as a general rule, a prosecutor should refrain from attacking the integrity and ethical standards of defense counsel. *United States v. Young*, 470 U.S. at 9, 105 S.Ct. at 1043 (it is improper for an attorney to make "unfounded and inflammatory attacks on the opposing advocate."); *United States v. Murrah*, 888 F.2d 24 (5th Cir.1989) (reversing arson conviction where prosecutor accused defense counsel of hiding expert retained for trial preparation so that expert could not be called as a government witness); *United States v. McLain*, 823 F.2d 1457, 1462–63 (11th Cir.1987) (finding plain error where prosecutor repeatedly accused defense counsel of "intentionally misleading the jurors and witnesses and of lying in court"); *Bruno v. Rushen*, 721 F.2d 1193, 1194 & n. 3 (9th Cir.1983) (per curiam), *cert. denied*, 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984) (affirming grant of habeas petition on basis of prosecutorial argument which hinted that the defendant's retention of counsel was probative of his guilt and accused defense counsel of fabricating testimony in return for legal fees).

■ However, this ethical constraint does not inhibit a prosecutor from introducing relevant evidence which happens to implicate a defense attorney in the same criminal activities charged against the accused, provided that advance warning is given to the defense so that there is an opportunity for appropriate motions.[83] *See United*

States v. Arzola–Amaya, 867 F.2d 1504, 1516 (5th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). The cases cited above are not to the contrary, as the courts' holdings were limited to situations where the prosecutorial attack is irrelevant to the matter being tried and lacks any evidentiary support. Thus, the *Murrah* court wrote that a "prosecutor may not challenge the integrity and ethical standards of defense counsel *unless the prosecutor has certain proof of an offense and the matter is relevant to the case being tried."* 888 F.2d at 27 (emphasis supplied). Similarly, in *Bruno*, the court specifically noted that "the prosecutor offered nothing from the evidence adduced at trial to support his suspicions that defense counsel had agreed for the sake of profit to aid in fabricating a defense." 721 F.2d at 1194. Thus, neither *Murrah* nor *Bruno* suggest that the type of "unfounded and inflammatory attack on [an] opposing advocate" condemned in *Young* occurs whenever the government's evidence of a particular offense casts a defense attorney in an unfavorable light.

■ In this case, the evidence concerning Simone was highly probative of the appellants' guilt of the Rouse extortion. Given its extensive forewarnings and the appellants' failure to object throughout the trial, the government had no obligation to restructure its case so as to avoid references to Simone as an unindicted co-conspirator simply because Scarfo chose to retain Simone as his trial counsel. Indeed, we are aware of no cases in which a defendant's choice of counsel has been held to take

extortion. Brief for Narduccis at 42–43, 44, 47. According to the government, the Narduccis' claim is completely unfounded, as all defense counsel were present at the pretrial hearing at which the potential conflict of interest between Simone and Scarfo was disclosed. Brief for the United States at 169. We will not take sides in this fray. We would not be justified in accepting the government's representation because the hearing transcript does not indicate which defense attorneys were present; it only identifies those who spoke at the hearing. However, we do note that there was close cooperation between the defense attorneys in this case. Moreover, any defense attorneys who genuinely were surprised by the proof at trial were free to object or move for a severance at that time.

Because appellants failed to do either *at any time* during the trial, plain error review is appropriate.

**83.** In such cases, upon the defendant's motion, the district court should consider the possibility of redacting the attorney's name from trial exhibits and from the indictment if they indicate that the attorney may have been criminally involved in the charged offenses. *See United States v. Moya–Gomez*, 860 F.2d 706, 763 (7th Cir.1988) (recognizing the power of district courts to redact from indictments superfluous language which unfairly prejudices the accused).

precedence over the government's discretion in deciding what charges to prosecute and how to present its case. Where a defense attorney faces potential criminal liability for the same activity charged against his client, the attorney's ability to represent effectively the client obviously will be hampered by an actual conflict of interest. *Government of the Virgin Islands v. Zepp*, 748 F.2d 125 (3d Cir.1984) (finding irreconcilable conflict of interest where defendant was prosecuted for destroying evidence and she and her attorney were the only individuals present at the scene of the crime). In such circumstances, the trial court has a duty to elicit the defendant's knowing and intelligent waiver of the conflict and, if the court deems the waiver ineffective to safeguard the defendant's rights, to take other precautionary measures, including disqualifying the attorney. *Zepp*, 748 F.2d at 139; *United States v. Dolan*, 570 F.2d 1177, 1182 (3d Cir.1978) ("exercise of the court's supervisory powers by disqualifying an attorney representing multiple defendants in spite of the defendants' express desire to retain that attorney does not necessarily abrogate defendants' sixth amendment rights."). In no case, however, must the government's exercise of prosecutorial discretion yield to the defendant's choice of counsel.[84]

But here, the appellants cannot even assert a conflict of interest impeding Simone's representation of them because Simone represented only Scarfo. While Simone may have figured prominently in formulating and presenting the unified defense, that does not mean that he enjoyed an attorney-client relationship with every appellant in this case. At most, appellants have alleged that their defense suffered from a prejudicial "spillover" of evidence implicating Simone. If at trial, appellants believed that the spillover effect of the evidence was likely to influence unfairly the jury's verdict against them, they could have moved for a severance on that ground or requested other curative measures. *See United States v. Sandini*, 888 F.2d at 307; *United States v. De Larosa*, 450 F.2d 1057, 1065 (3d Cir.1971), *cert. denied*, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). Their failure to do so is fatal to the claim they raise on appeal.[85]

In reaching this conclusion, we are influenced by the fact that appellants not only failed to request a severance on this ground at trial, but, in several instances, highlighted the evidence inculpating Simone during their closing summations in an attempt to show bias on the part of government witnesses. For example, defense counsel for Salvatore Merlino, in arguing that Caramandi was biased against the appellants, discussed at length Cara-

---

84. Of course, it would be a rare case in which a defendant, after convincing the trial court not to disqualify his attorney of choice, should be able to obtain a reversal of his conviction on the basis of a conflict of interests. The district court should not be placed in the no-win situation of being confronted with a claim of a Sixth Amendment violation if the defendant is convicted, regardless of whether it has ceded to the defendant's expressed desire to be represented by his conflict-ridden attorney, or has taken it upon itself to disqualify the attorney. If the defendant after disclosure insists on continued representation by the attorney and the court permits the representation to continue, any error is invited.

85. This should not be construed to mean that appellants' trial attorneys were ineffective because of their failure to request a severance. Indeed, it may have been completely reasonable to present a unified defense at trial. The appellants' problem was that the evidence against

each of them was overwhelming. Furthermore, the attorneys might very well have concluded that any motion for a severance would have been unsuccessful, as "it is well established that judicial economy favors a joint trial where defendants are jointly indicted ... and where defendants are charged with a single conspiracy." *Sandini*, 888 F.2d at 305 (citations omitted). Severance may be appropriate where there is such a disparity of evidence that the jury cannot "reasonably be expected to compartmentalize the evidence as it relates to separate defendants." *United States v. De Larosa*, 450 F.2d at 1065. However, as observed in *Sandini*, "it is difficult to conclude that there is a prejudicial spillover where ... there is substantial independent evidence of a defendant's guilt." 888 F.2d at 307. Given the strength of the government's case against the appellants, their attorneys might have had a difficult time convincing the trial court that the evidence implicating Simone would cause such severe prejudice as to require a severance.

mandi's testimony that he cooperated with the government because Scarfo and Simone were conspiring to murder him:

> At the end of one session of his testimony, [Caramandi] concluded on what he conceived to be a high point, I became a government informant because Nick Scarfo and Bobby Simone were going to kill me. A lawyer in this case was going to kill him. I don't know if Mr. Simone is going to make any comment on the topic, but I think that's a personal affront, not just to Mr. Simone, not just to the defense team in this case, but to the whole system, when a witness is let to go so out of hand that he accuses a lawyer in the presence of the jury of a murder plot.... [T]hat's an example of the depths to which this witness will sink to hurt these fellas.

Tr. 11/14/88 at 70.

It is difficult for us to conclude that plain error occurred when the appellants themselves specifically urged the jury to consider the allegedly prejudicial material as an adverse element in the government's case against them.[86]

■ We have already determined that the evidence concerning Simone was relevant and material to the charges being tried, and therefore, the government's use of it was entirely proper. We further conclude that even if the evidence was harmful to Scarfo's co-defendants, absent an objection or a motion for a severance, the district court had no obligation to order a severance or to restrict the scope of the testimony or the government's latitude in closing argument. The arguments appellants now raise were fully available to them at trial. Possibly, they chose not to pursue the matter, so as not to undermine the unified defense front presented at trial. But whatever the reason for appellants' silence, they have not preserved the matter for appeal or persuaded us that the references to Simone were plain error.

---

**86.** We also observe that the appellants may have been assisted by the evidence regarding Simone because Caramandi, after testifying about the alleged murder conspiracy between Scarfo and

Simone, retracted his testimony to the extent that it mentioned Simone. This retraction could have undermined Caramandi's credibility before the jury.

## H. CHALLENGES TO THE JURY INSTRUCTIONS

### 1. *Instructions Regarding Reasonable Doubt*

■ During his closing statement, Joseph Grande's attorney, Willis W. Berry, Jr., Esq., purported to illustrate the degree of evidence needed to overcome a defendant's presumption of innocence by physically balancing a brick on a scale against a few coins. Tr. 11/15/88 at 34–37. He analogized the brick to the appellants' presumption of innocence and the coins to the government's case. He also stated that to find the appellants guilty beyond a reasonable doubt, the jury had to be convinced of guilt to a "moral certainty," *id.* at 38, and that the appellants were entitled to the benefit of "any doubt." *Id.* at 42. The court sustained the government's objections to these latter remarks on the ground that they misstated the law regarding reasonable doubt.

After Grande's attorney completed his summation, the district court *sua sponte* instructed the jury about the meaning of "reasonable doubt." Following some preliminary remarks concerning the burden of proof in civil cases, the court stated:

> In a civil case, we often refer to a scale and we say that in order to meet their burden of proof, the plaintiff in a civil case must present evidence of such a quality that the scales at least tip in their favor. That is not the standard in a criminal case. In fact, in a criminal case we make no reference to the scale whatsoever, any reference to the scale is improper, we don't use that. Instead, we use a different standard for what proof beyond a reasonable doubt is.... [R]easonable doubt is a doubt which would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in their own affairs. That's what a reasonable doubt is, and that in order to convict, in order to find proof beyond a reasonable doubt,

you must be firmly convinced of the guilt of someone.

Tr. 11/15/88 at 44.

In response to Scarfo's attorney's objection that the above instruction suggested that the burden of proof was greater in a civil case than in a criminal case, the court gave a supplemental instruction:

> Just so there's no doubt I would read to you again the definition of reasonable doubt from the pattern charge. As I've said many times, the Government has the burden of proving a defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases where you were told that it is only necessary to prove that a fact is more likely true than not true, that is that the scales must tip in favor of the plaintiff. In criminal cases, the Government's proof must be more powerful than that, it must be beyond a reasonable doubt.

*Id.* at 49.

The court then reiterated its definition of reasonable doubt.

Although Grande does not allege that the district court's instructions were erroneous, he argues that the court abused its discretion in delivering the instructions immediately after his attorney's closing statement. In doing so, Grande alleges, the district court improperly led the jury to believe that his trial counsel had said something inaccurate during closing and that "the closing was to be ignored." Brief for J. Grande at 15, 17. This claim is devoid of merit.

 As the district court stated in its post-trial decision, Berry's closing argument "grossly misstated the government's burden of proof." 711 F.Supp. at 1323 n. 9.[87] Berry's performance with the scale and his comments concerning reasonable doubt inaccurately conveyed to the jury that it could not deliver a guilty verdict if there was *any* possibility of innocence, however remote. The requirement in crim-

inal trials of proof beyond a reasonable doubt does not mean that the jury must rule out every trifling possibility of innocence. *United States v. Campbell,* 874 F.2d 838, 842 (1st Cir.1989). Instead, reasonable doubt may be defined as doubt which "would make a reasonable person hesitate to act in regard to some transaction of importance and seriousness." *United States v. Munson,* 819 F.2d 337 (1st Cir.1987); *United States v. Colon,* 835 F.2d 27, 31–32 (2d Cir.), *cert. denied,* 485 U.S. 980, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1987); *United States v. Wosepka,* 757 F.2d 1006, 1009 (9th Cir.), *modified on other grounds,* 787 F.2d 1294 (9th Cir.1985).

Moreover, Berry's use of the scale was a blatant attempt to quantify reasonable doubt, a practice which has met with strong disapproval in federal courts. *United States v. Anglada,* 524 F.2d 296, 300 (2d Cir.1975) (while not reversible error, "characterization of the standard as quantitative rather than qualitative ... might better have been omitted"); *United States v. Clay,* 476 F.2d 1211, 1213–15 (9th Cir.1973) (disapproving of any reference to balancing test in reasonable doubt instruction). *Cf. United States v. Link,* 202 F.2d 592, 594 (3d Cir.1953) (jury instruction encouraging jury to "balance" the evidence and acquit if the evidence was "as equally consistent with innocence" as with guilt, improperly suggested a preponderance of the evidence standard).

The district court's prompt issuance of an instruction on reasonable doubt was an entirely appropriate remedial response to Berry's improper remarks in closing. We find no abuse of discretion.

2. *Instructions Regarding RICO and Co–Conspirator Liability*

After instructing the jury at length about the essential elements of a RICO conspiracy offense, the district court elabo-

---

**87.** It is noteworthy that the Courts of Appeals for the Fourth and Seventh Circuits consider it improper for either trial attorneys or the district court to elaborate on the meaning of reasonable doubt because the term is not susceptible of precise definition and explanations often are confusing to the jury. *United States v. Glass,* 846 F.2d 386, 387 (7th Cir.1988); *United States v. Woods,* 812 F.2d 1483, 1487–88 (4th Cir.1987).

rated upon the general law of conspiracy, stating in pertinent part that:

a conspiracy is like a train, and where one party knowingly steps on board that train he's a part of the crew. Knowingly now. He becomes a part of the crew and assumes conspirators' responsibility for the existing freight or conduct, regardless of whether he is aware of just what it is composed of.

Tr. 11/19/88 at 116.

Judging from the context, these comments appear to have been made in response to the closing arguments of certain defense counsel that their clients were too young to be held responsible for criminal conduct occurring at the outset of the RICO conspiracy, in 1976.[88] *Id.* at 115. The district court followed its "train" analogy with an instruction concerning the circumstances under which the jury could consider co-conspirators' statements against defendants not present at the time the statements were made.[89]

Following the court's charge, defense counsel promptly objected to the "train analogy" on the ground that it improperly suggested that membership in the Mafia in itself was an offense. Tr. 11/17/88 at 135. Joseph Pungitore's attorney added that "[t]he example you gave about the train, that you have to have it proven beyond a reasonable doubt that you know what's going on, you know where the train is going, you know what they're doing ..." *Id.* at 136. In response to these objections, the district court gave the following supplemental instruction:

I want to stress one thing. I gave you the example of the train and that was quoted from *United States v. Barnes* [sic]. But I want to emphasize one word because I think it's important.

*Proof of membership in the Mafia in and of itself is not sufficient to convict, just standing by itself is not sufficient to convict.* Now I told you conspiracy is like a train, and it is. But when a party knowingly steps aboard, it must be knowingly. You've got to know. Then he is part of the crew and assumes conspirators responsibilities. And he assumes those responsibilities for the existing freight or conduct, regardless of whether he is aware of just what it is composed of.

*Id.* at 136 (emphasis supplied).[90]

Defense counsel then assured the court that the jury instructions were satisfactory. *Id.* at 138.

 Appellants Scafidi, Ciancaglini, Joseph Pungitore, and Joseph Grande now complain that the train analogy invited the jury to convict on the RICO conspiracy charges without finding that individual appellants had the requisite specific intent regarding the underlying predicate acts. Brief for Ciancaglini at 44. They argue that the agency theory of co-conspirator liability reflected in the instruction is primarily relevant to the admissibility of co-conspirator statements under Fed.R.Evid. 801(d)(2)(E) and does not bear directly on substantive conspiracy law. They further maintain that even in cases involving Rule 801(d)(2)(E), "this Court has consistently condemned the delivering of any jury instructions on the coconspirator hearsay exception." Brief for J. Pungitore at 39 (cit-

---

**88.** For example, Joseph Grande's attorney stated in his closing argument: "My client, look at him, will you look at him, he's just a boy, a young man. In '76, 12 years ago, he was, he wasn't in swaddling clothes but you can believe he probably wasn't even out of high school, was he a member of the LCN, the whatever it is the mob then. The proof is in the pudding and the pudding is putrid." Tr. 11/15/88 at 33.

**89.** The district court explained that:

Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed and that the defendant was one of its members then the statements know-

ingly made and acts knowingly done by any other member may be considered by the jury against that defendant. This is so even though the acts or declarations were not made in his presence and were done without his knowledge as long as the statements were made or the acts were done during the course the conspiracy, and in furtherance of some object or purpose of the conspiracy.
Tr. 11/17/88 at 117.

**90.** *United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987), was the source of the train analogy used by the district court. *United States v. Scarfo,* 711 F.Supp. at 1348.

ing *United States v. Continental Group, Inc.*, 603 F.2d 444, 460 (3d Cir.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980)).[91]

■ "We will grant a new trial if the district court erred as a matter of law instructing the jury." *United States v. Phillips*, 874 F.2d 123, 128 (3d Cir.1989). However, because no objection was made to the supplemental jury instructions, we may reverse only if the alleged error amounted to plain error. *See United States v. Thame*, 846 F.2d 200, 204–06 (3d Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988). We find no plain error.

■ First, contrary to appellants' assertions, we have never "condemned" the practice of giving jury instructions on the admissibility of co-conspirator's statements against individual defendants. In *Continental Group*, we suggested in dicta that jury instructions concerning the factual foundation required for application of the co-conspirator exception to the hearsay rule are best omitted, as they give the jury the "opportunity to second-guess the court's decision to admit coconspirator declarations." 603 F.2d at 459. We observed, however, that such instructions could not give rise to reversible error because, if anything, they inure to the benefit of the defendant. *Id.* In short, appellants' reliance on *Continental Group* is misplaced.

■ Second, the disputed comments were an accurate explanation of substantive conspiracy law. It is true that many of the recent cases discussing the agency theory of co-conspirator liability have involved disputes concerning the admissibility of co-conspirator statements under Fed.

R.Evid. 801(d)(2)(E). *See United States v. Fields*, 871 F.2d 188, 194 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989) ("When a party jumps aboard the 'conspiracy train' he assumes responsibility for all conduct whether or not he is conscious of its extent" and therefore a co-conspirator's statements in furtherance of the conspiracy made before the defendant entered the conspiracy are admissible against him); *United States v. Baines*, 812 F.2d 41, 42 (1st Cir.1987) (same); *United States v. Jannotti*, 729 F.2d 213, 221 (3d Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984); *United States v. Tombrello*, 666 F.2d 485, 490–91 (11th Cir.), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982). *See also United States v. United States Gypsum Co.* 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948) (espousing same rule regarding admissibility of co-conspirator statements as that embodied in Rule 801(d)(2)(E)). However, while the above cases directly concerned the reach of Rule 801(d)(2)(E), that does not mean that the principle of co-conspirator liability has force only in the context of evidence questions. Rather, the principle formed part of the common law of conspiracy which itself gave rise to the evidentiary rule. *Baines*, 812 F.2d at 42 ("Fed.R.Evid. 801(d)(2)(E) does not change the common law.").

The concept that co-conspirators act as mutual agents for one another has been a longstanding principle of conspiracy law. *Pinkerton v. United States*, 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946) (co-conspirators are liable for all foreseeable substantive offenses committed during the course of and in furtherance of a conspiracy). In *United States v.*

---

**91.** Pungitore raises the additional contention that the charge "functioned as a type of diluted *Pinkerton* charge" because it created an undue risk that the jury would find guilt of individual predicate acts, as well as of non-RICO charges, based solely on evidence of the appellant's participation in the conspiracy. Brief for Pungitore at 38–41. But as Pungitore concedes, the argument was not made to the district court and thus reversal is required only if the alleged *Pinkerton* problem gave rise to plain error. *Id.* Even if we accepted Pungitore's strained inter-

pretation of the train analogy, we could not possibly find plain error here, in view of the district court's vigilance in instructing the jury that mere membership in the Mafia did not constitute a crime. Tr. 11/17/88 at 112, 136. In addition, the court repeatedly advised the jury that to convict on the substantive RICO charges, it had to find unanimously that the defendant personally participated in or aided or abetted at least two racketeering acts. *Id.* at 58, 108.

*Riccobene*, 709 F.2d at 224, we agreed with the Court of Appeals for the Fifth Circuit that "in enacting section 1962(d), Congress did not radically alter traditional conspiracy law except to the extent that it proposed a dramatically new conspiratorial objective." Thus, it was not error for the district court to include in its RICO conspiracy instructions comments concerning "traditional conspiracy law."

To be sure, had the district court confined its RICO conspiracy instructions to general conspiracy doctrine, there could have been a problem, as the defendant's assent to the commission of the predicate offenses is an essential element of the RICO conspiracy offense. *See id.* However, the district court's instructions, read in their entirety, were sufficiently balanced to convey to the jury the distinguishing characteristics of a RICO conspiracy. Accordingly, we find no merit to the appellants' challenge to the RICO conspiracy instructions.

## I. EVIDENCE QUESTIONS

1. *Expert Testimony, Special Agent James Kossler*

 Special FBI Agent James Kossler testified as an expert as to the structure of organized crime families within the Italian Mafia. Tr. 9/30/88 at 47. He also explained the meaning of coded language used by the co-conspirators in intercepted conversations concerning their roles in the enterprise. *Id.* at 59.

Appellants do not deny that Kossler was qualified as an expert on La Cosa Nostra or that his testimony about the meaning of organized crime jargon used by the co-conspirators was admissible under prior decisions of this court. *See United States v. Riccobene*, 709 F.2d at 230–31. Brief for Ciancaglini at 33. However, they assert that Kossler's testimony exceeded the scope of admissible expert testimony when he identified the individuals depicted in several surveillance photographs as substantial Mafia figures and associates from New

York crime families meeting with various appellants.[92] For example, he stated that one such photograph depicted James Angelina, then acting boss of the Columbo crime family in New York, meeting with Scarfo. Tr. 9/30/88 at 67. Appellants claim that this was "factual testimony in the guise of expert testimony" because it created an overwhelming impression that appellants must have been engaged in organized crime because they were meeting with high ranking organized crime figures.

We reject this contention for a variety of reasons. At the outset, we observe that appellants did not object to Kossler's testimony and therefore, if any error occurred, it must rise to the level of plain error to justify reversal of appellants' convictions. *United States v. Young*, 470 U.S. at 15, 105 S.Ct. at 1046.

As explained in *United States v. Theodoropoulos*, 866 F.2d 587 (3d Cir.), *mandamus denied*, —— U.S. ——, 109 S.Ct. 1179, 103 L.Ed.2d 246 (1989), "[t]he overriding limitation on expert testimony is the requirement that '[u]nder Rules 701 and 702, opinions must be helpful to the trier of fact.'" *Id.* at 591 (quoting Advisory Committee Notes to Fed.R.Evid. 704). Under Rule 704, an expert opinion "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a). Applying these principles, several courts, including this one, have approved the admission of expert testimony in circumstances in which stronger arguments against admissibility could be made than in this case. *See, e.g., United States v. Angiulo*, 897 F.2d at 1189 (expert could testify as to roles defendants played in illegal gambling operation); *Theodoropoulos*, 866 F.2d at 591–92 (same, in context of complex narcotics organization); *United States v. Kinsey*, 843 F.2d 383, 387–89 (9th Cir.), *cert. denied*, 487 U.S. 1223, 108 S.Ct. 2882, 101 L.Ed.2d 916 (1988) (police officer could testify about defendant's involvement in the distribution of cocaine). Considering that opinion testimo-

---

**92.** Although Kossler's most extensive experience was with La Cosa Nostra families in New York and New Jersey, Tr. 9/30/88 at 18, 32, 34, he had sufficient familiarity with organized crime activities in Philadelphia to identify ranking members of the enterprise. *Id.* at 35, 47, 64–65.

ny satisfying the helpfulness requirement of Rule 702 is admissible, even where it expressly implicates the defendants in the very activities charged in the indictment, we would be hard pressed to find that the admission of Kossler's testimony constituted error, much less plain error.

The helpfulness requirement of Rule 702 was met, as Kossler's testimony provided the jury with useful background information as to the structure of La Cosa Nostra families and the interplay between them on the national level.[93] *See Theodoropoulos,* 866 F.2d at 592 ("In dealing with organized crime or illegal narcotics operations, a lay jury is unlikely to have knowledge as to the structure of the organization or the interrelationships between the participants."). His identification of Scarfo and the New York bosses in the photographs was purely incidental to that testimony and, in any event, did not implicate them in any crimes. In fact, this latter point was fully explored during Kossler's cross-examination.[94] Thus, we fail to see what issues of ultimate fact were taken from the jury—the jury was left to draw its own conclusions as to the significance of Scarfo's meetings with the individuals shown in the photographs. We conclude that Kossler's testimony fell squarely within the boundaries of admissible expert testimony.

### 2. *Reference to D'Alfonso Murder*

■ Salvatore Wayne Grande contends that the district court's admission of an intercepted conversation between him and DelGiorno containing a reference to the D'Alfonso murder was reversible error because the evidence had no relevancy to any issue other than his propensity for violence and as such, did not constitute admissible evidence of other crimes under Fed.R.Evid. 404(b).[95] Brief for S.W. Grande at 11–13. In response to defense counsels' objections,[96] the government asserted that the tape was offered to show the relationships among the co-conspirators, especially in reference to the shakedown operation, and that it would not question any witness about the D'Alfonso murder.

The district court permitted the government to play the tape and question DelGiorno extensively about its contents. Tr. 10/12/88 at 114–28. In its post-trial decision, the district court, in rejecting Grande's argument that he was thereby prejudiced, explained that "any references

---

**93.** He testified that "there was a ruling body to La Cosa Nostra which is known as the Commission and it was made up of various bosses from various families and their job was to set policy and to mediate disputes that may come between the families." Tr. 9/30/88 at 49.

**94.** Kossler conceded during cross-examination that the meetings between appellants and the New York organized crime figures may have been entirely innocent:

Q: Do you know what the discussions were in the photographs involving those people?
A: I have no idea.
Q: So you're guessing and speculating then aren't you as to them talking about criminal conduct?
A: I think based upon my experience and the fact that I know who those people are, what their roles are and what their functions are that they—the probability exists.
Q: Probability exists, it's not proof is it?
A: That's correct.
Tr. 9/30/88 at 71.

**95.** Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**96.** In addition to arguing that the tape contained inadmissible other crimes evidence, Tr. 10/10/88 at 26–27, Salvatore Grande's attorney, along with other defense attorneys, contended that the tape could not be used to prove the enterprise's code of silence, that is, the *"omerta,"* as argued by the government. Tr. 10/10/88 at 28, 32, 48–49. In the tape, Grande and Del-Giorno purportedly referred to a civil contempt sanction imposed on Grande for invoking the Fifth Amendment during a proceeding in which he had been granted immunity. Tr. 10/10/88 at 28–29. According to the government, as the grant of immunity precluded Grande from invoking the Fifth Amendment, there was no constitutional problem in using the evidence to corroborate testimony concerning the code of silence. *Id.* This issue has not been renewed on appeal and, in any event, the government ultimately agreed not to question any witnesses concerning the contempt sanction or refer to it during closing argument. Tr. 10/12/88 at 111, 113.

to ... the murder investigation of Frankie Flowers ... were, without explanation, vague and meaningless." 711 F.Supp. at 1343. Accordingly, as the government had complied with the district court's order prohibiting it from exploring that issue during its examination of DelGiorno, it concluded that Grande suffered no unfair prejudice from the admission of the tape. *Id.*

We agree with the district court that the references to the D'Alfonso murder are unintelligible without explanation. So far as we can ascertain, the following remarks, made after Charles Iannece informed DelGiorno that subpoenas had been issued for DelGiorno and Grande,[97] form the primary basis for Grande's objection:

> DELGIORNO: The cops said where they at, down the shore? He [Iannece] said probably. You can't tell 'em we were down here. He knew we were down the shore. He said where are them fucking guys at, down the shore again? He said probably.
>
> GRANDE: Well what did they say, what name did they say, Wayne?
>
> DELGIORNO: Grande, no they said Wayne (laughter). They said Salvatore Grande.
>
> . . . . .
>
> GRANDE: What did they say?
>
> DELGIORNO: We got subpoenas for them. He said for what. They said for Flowers [D'Alfonso]. So Charlie says so where are they at down the shore? Charlie said probably. Tell 'em we got

'em ... so Nicky Crow says to them, well...

> GRANDE: What do ya mean we got 'em?
>
> DELGIORNO: We got subpoenas.

Book F, 8/30/85, 6:03 p.m. at 1–2.

The parties went on to discuss the possibility of hiding out for a couple of weeks, presumably to avoid responding to the subpoenas.[98]

■ Although the jury could infer from these remarks that Grande and DelGiorno contemplated flight in response to the subpoenas, the jury had no way of knowing that the subpoenas were issued in connection with the D'Alfonso murder. Therefore, we do not reach the question of whether evidence concerning the D'Alfonso murder was admissible under Rule 404(b), as we conclude that the reference to the murder was too oblique to constitute evidence of other crimes. Accordingly, we reject Grande's contention for the reasons expressed in the district court's opinion.[99]

### 3. *Evidence of Iannece's Flight*

FBI Agent Charles Warner testified that government witness Nicholas Caramandi became an informant on November 14, 1986. After that date, Warner saw little of Iannece in the south Philadelphia area. Tr. 11/8/88 at 31. In January 1987, an arrest warrant was issued for appellant Charles Iannece in connection with the Rouse extortion and Warner attempted to locate him. After some initial difficulties, Warner apprehended Iannece on October 29, 1987, at a residence in Lake Harmony, Pennsylvania, where Iannece had been staying.[100] In

---

**97.** *See* Book F, 8/30/85 conversation between Charles Iannece and Thomas DelGiorno.

**98.** GRANDE: Do you really think we have to go away ... no fucking way around?
DELGIORNO: What do you mean, go away. Hide for a couple of weeks?
GRANDE: Yeah, yeah.
DELGIORNO: Couple weeks.
GRANDE: Yeah.
DELGIORNO: Yeah, we got, I ain't going the mother fuck over the ... there like you say I, you could save a month, you save a month, Wayne, I mean what the fuck. It's senseless to go there to go to jail ain't it?
Book F, 8/30/85 at 6:03 p.m., at 7–8.

**99.** Grande has not argued that evidence of the contemplated flight, standing alone, was so unfairly prejudicial as to require a reversal of his conviction. However, even had he done so, we would reach the same result. In view of overwhelming evidence of Grande's guilt, the suggestion that he planned to flee in response to a subpoena could not possibly have influenced the jury's verdict.

**100.** It was difficult to find Iannece because he was out of Philadelphia. The break came when telephone records disclosed that John Melini, also known as Johnny Cupcakes, who was under surveillance made a call to Lake Harmony. The residence to which the call was made was placed under surveillance and Iannece was found there.

a search of Iannece's residence conducted with Iannece's consent, Warner discovered various items bearing on Iannece's identification, four in the name of Donald Casolaro. One of the items identifying Iannece as Casolaro was a driver's license in the name of Casolaro, but with Iannece's picture showing him to be Casolaro. *Id.* at 38. Warner also found a loaded .32 caliber automatic Colt pistol, a loaded .22 caliber Smith & Wesson revolver, and several rounds of hollow-point ammunition. Warner testified that "[h]ollow-point ammunition is much more devastating upon impact than a regular bullet." *Id.* Warner also stated that the Smith & Wesson revolver had been reported stolen from an individual in Washington, D.C., in 1977. *Id.* at 38–39.

▆▆▆ Iannece asserts that he was entitled to a limiting instruction that the evidence of flight should be considered only in connection with the Rouse extortion, because he was in federal custody at the time of the RICO indictment and therefore, the flight had no probative value as to his guilt of other predicate acts included in the RICO charges. Brief for Iannece at 19–20.[101] He also argues that the district court should have excluded the evidence of guns and ammunition found during the search and that the reference to the stolen pistol was inadmissible "other crimes" evidence under Fed.R.Evid. 404(b). All of these contentions lack merit.

▆▆▆ Evidence of a defendant's flight after a crime has been committed is admissible to prove his consciousness of guilt. *United States v. Eggleton,* 799 F.2d 378, 380–81 (8th Cir.1986); *United States v. De Parias,* 805 F.2d 1447, 1454 (11th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987); *United States v. Miles,* 468 F.2d 482, 489–90 (3d Cir.1972). As the district court recognized, the admis-

sibility of flight evidence does not depend on whether the flight was triggered by an actual indictment, as " 'it is the act of departure that is itself evidential.' " *Miles,* 468 F.2d at 490 (quoting 2 Wigmore on Evidence § 276 (3d ed. 1970)). *See* 711 F.Supp. at 1321. In this case, Iannece became a fugitive soon after he learned that Caramandi had become a government informant. We agree with the district court that "Iannece's knowledge of Caramandi's cooperation could have triggered his flight," as Caramandi was capable of implicating him in many of the predicate acts included in the RICO indictment. 711 F.Supp. at 1321. *Accord United States v. Tille,* 729 F.2d 615, 622 (9th Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984) (jury reasonably could infer that defendant turned fugitive because of co-conspirator's cooperation). Thus, Iannece was not entitled to a limiting instruction, as the fact that he was in federal custody at the time the RICO indictment was returned did not mean that the evidence's relevancy was confined to the Rouse extortion charge.

▆▆▆ Similarly, the district court did not abuse its discretion in admitting evidence of the guns and ammunition found during the search. The court rejected defense counsel's claim that the weapons evidence was cumulative and unfairly prejudicial, reasoning that the weapons were admissible because they showed "more determined flight." Tr. 11/8/88 at 43. The district court had wide discretion in balancing the probative value of this evidence against its prejudicial impact. *United States v. Long,* 574 F.2d 761, 767 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). We find no error in the district court's determination, as it was consistent with the reasoning employed by other courts which have admitted weapons seized

101. We observe that this argument differs considerably from that made to the district court. At trial, Iannece moved to exclude the flight evidence on the ground that it related only to the Rouse extortion, which formed the basis of a separate prosecution. Tr. 11/7/88 at 67–70. When it denied the motion, the district court stated that "I've considered the fact there are a number of predicate acts in the circumstances

but I will permit evidence as to the flight." Tr. 11/7/88 at 81. Although the court's explanation was somewhat cryptic, its decision was clearly correct. Because the Rouse extortion was included as a predicate act in the RICO charges against Iannece, evidence of his flight was admissible even if offered solely to prove his consciousness of guilt as to that predicate act.

from a defendant in flight. *Eggleton*, 799 F.2d at 382; *De Parias*, 805 F.2d at 1454.

Moreover, given the violent nature of the enterprise and Iannece's role therein, the guns would be admissible to prove the offenses charged, regardless of whether they were introduced in the context of a flight. *See United States v. Adams*, 759 F.2d at 1108–09 (numerous weapons, including an Uzi submachine gun, were highly probative of the "large scale" of a narcotics distribution conspiracy and "the type of protection the conspirators felt they needed to protect their operation.") *See also United States v. Shakur*, 888 F.2d 234, 238 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1152, 107 L.Ed.2d 1056 (1990) (bomb-related equipment was admissible in RICO trial where "there was ample testimony that explosives played a part in the planning and tactics of the 'family's' crimes, and were consistent with the violent ends of the group."). Accordingly, Iannece did not suffer any unfair prejudice as a result of the district court's admission of the weapons evidence.

## IV. CONCLUSION

We have considered appellants' remaining contentions and find them to be without merit.[102] We are satisfied based on our intensive review of this matter that there is no question but that the appellants received a fair trial and were guilty of the offenses of which they were convicted and for the foregoing reasons, the judgments of sentence and conviction entered with respect to each appellant will be affirmed.

---

**102.** Ralph Staino contends that physical evidence seized during a search of his residence in the Dominican Republic should have been suppressed because the search, conducted as a joint venture between Dominican and United States authorities, did not satisfy Fourth Amendment standards. Brief for Staino at 10–14. In *United States v. Staino*, 690 F.Supp. 406 (E.D.Pa.1988), wherein Staino was convicted under 21 U.S.C. §§ 846, 952, 960, and 963 of conspiring to import and importing PCP, Staino raised and lost the same argument with respect to the same search. *Staino* was affirmed by this court in an unpublished opinion. *United States v. Staino*, 888 F.2d 1383 (3d Cir.1989) (Tables).